In the Interest of L.S., P.P., G.S., and M.S., Minor Children.

No. 07-87-0066-CV.

Court of Appeals of Texas, Amarillo.

March 31, 1988.

Rehearing Denied April 26, 1988.

Samuel T. Jackson, West Texas Legal Services, Amarillo, for appellant.

Bill Baumann, Co. Atty., Chris Kloeris, Carla J. Gibbs, Asst. Co. Attys., Amarillo, for appellee.

Before DODSON, COUNTISS and BOYD, JJ.

DODSON, Justice.

The record shows that the Texas Department of Human Services ("the DHS"), the appellee, brought this action against A.M.S., the appellant, to terminate her parental rights to her four daughters. The case was tried before a jury. Based on the jury's answers to submitted special issues, the trial court rendered judgment terminating the mother's parental rights to her four

daughters. On appeal, she challenges the judgment by six points of error claiming there is no evidence and factually insufficient evidence to support certain jury findings and that the trial court erred by overruling her objections to certain testimony. We affirm.

To terminate parental rights without the parent's consent, there must be both a finding that the parent has committed at least one of the enumerated acts under section 15.02(1) of the Texas Family Code Annotated (Vernon 1986) and a finding that termination is in the best interest of the child. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). The pertinent portions of section 15.02 provide:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

\* \* \* \* \* \*

(D) *knowingly placed* or *knowingly allowed* the *child to remain in conditions or surroundings* which endanger the physical or emotional well-being of the child; or

(E) *engaged in conduct* or *knowingly placed the child with persons who engaged in conduct* which endangers the physical or emotional well-being of the child;

\* \* \* \* \* \*

and in addition, the court further finds that

(2) termination is in the best interest of the child. (emphasis added)

Here, the jury answered affirmatively to special issues based on subsections (D) and (E) and to issues based on section (2) of section 15.02. Since subsections (D) and (E) of 15.02(1) are framed in the disjunctive, evidence to support either the mother's own conduct *or* the conduct of others with whom she knowingly placed the children is evidence to support termination.

In response to special issues, the jury specifically found: (1) that the appellant knowingly placed or knowingly allowed each of the children to remain in conditions or surroundings which endangered the emotional or physical well-being of each of the children; (2) that the appellant had engaged in conduct or knowingly placed each of the children with persons who engaged in conduct which endangered the emotional or physical well-being of each of the children; and (3) that termination of the parent-child relationship between the appellant and each of the children would be in the best interest of each of the children.

First, we will consider the appellant's points of error by which she challenges the legal and factual sufficiency of the evidence to support the jury's findings. By points of error one, two, and three, the appellant claims the evidence is legally insufficient (*i.e.,* no evidence) to support the jury's findings stated in number one and two in the preceding paragraph. By point of error six, she challenges the factual sufficiency of the evidence to support the jury's finding stated in number one of the preceding paragraph.

The natural right existing between parent and child is of constitutional dimension, and, consequently, involuntary termination proceedings must be strictly scrutinized. *In the Interest of G.M.,* 596 S.W.2d 846 (Tex.1980). For these reasons, the Texas Supreme Court has held that the evidence in support of the jury findings must be clear and convincing before the trial court may render judgment for involuntary termination. *Id.* at 847. The clear and convincing standard of proof is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*

In considering the attack on legal sufficiency of the evidence, we must consider only the evidence and inferences which support the finding, and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In considering the attack on the factual sufficiency of the evidence, we must consider all of the evidence in favor of and contrary to the challenged finding and ascertain if the finding is supported by clear and convinc-

ing evidence. *See In Interest of G.M.*, 596 S.W.2d at 847.

The record reveals that before action was taken by the DHS, the mother was living in a home with her four girls and a man named Eusebio Fuentes (also known as "Junior"), who lived in the home most of the time. The mother does not know the whereabouts of the girls' respective fathers; she only knows their names. The mother was unemployed and received Aid for Families with Dependent Children and food stamps in order to support her children.

The girls' situation first came to the attention of the DHS when the youngest child was eighteen months old. On 10 January 1986, the mother brought L.S., the youngest daughter, to the hospital due to a broken left leg. The child had not received any treatment for three weeks after the fall which caused the break. When asked how the break occurred, the mother gave three different explanations. The explanation that was finally accepted by Randy Daniels, a caseworker for the DHS, was that the child had fallen off a tabletop at a laundromat. At this time the child also had scratch marks on her body. When asked why she had not brought the child in earlier, the mother replied that since the child did not cry very much, she did not think she was hurt. After an investigation, the DHS concluded that the mother was guilty of medical negligence.

Fifteen days later, on 25 January 1986, the same child was again brought to the hospital due to a second break in the same leg. This break was in the thigh portion of the leg, while the other was in the lower, or calf, portion of the leg. This break was the result of the child falling off a bed. When asked for an explanation, the mother said she had left the child with Eusebio Fuentes and when she came back, the child was on the floor and crying. When the child was brought to the hospital, a physical examination was conducted and a vaginal discharge discovered. After testing, it was determined that the eighteen-month-old baby had gonorrhea, a sexually transmitted disease.

When the mother was informed of this, she told the caseworker that she did not think she could protect the child at that time and that she wanted the child to be put in foster care. When asked who could have spread the disease to the child, the mother replied that Fuentes was the only one who could have done it because he was the only one with access to the girls. During the course of the DHS investigation, it was also determined that the other three children had been sexually abused. At this time, the children were removed from the home and placed in foster care.

When the mother named Fuentes as the possible perpetrator, Daniels told her not to allow Fuentes into the home while the children were there. There is evidence in the record that on one of the children's visits to the home, Fuentes was present and sexually abused the girls. This visit was on 18 July 1986. At that time, the DHS was allowing the mother visits every other week. After the 18 July visit, the children were extremely emotionally disturbed. G.S. refused to be touched and M.S. threw herself on the floor and remained in a fetal position. The baby became very upset and was reluctant to have her diaper changed. In addition, medical evidence revealed that the girls had been molested again. The mother denied Fuentes had been in the home that weekend, although the children said he had been. When confronted with the medical evidence of abuse, the mother accused her eight-year-old daughter, P.P., of sexual abuse of the other children. After this incident, visitation rights of the mother were terminated. The mother made no attempts to contact her children or the DHS from this time until the time of trial.

Daniels also testified to a previous investigation which had been conducted by the DHS involving the mother and her oldest daughter, P.P. In that investigation, it was determined that Louis Herrera, a previous live-in boyfriend, had sexually abused the oldest daughter. This incident was reported to the police by the mother because she observed Herrera committing sexual acts with her child. Herrera subsequently

pleaded guilty to, and was convicted of, sexual abuse of a child. The DHS removed P.P. from the home for a short period of time, but she was later returned.

Daniels testified that it was his opinion that the mother had placed the children in surroundings which would endanger their physical and emotional well-being and that termination would be in the best interest of the children.

Dr. Robert Hubbard and nurse Debbie Beard both testified to the physical evidence of sexual abuse on G.S. and M.S., the middle daughters. The examination of M.S., the four-year-old, revealed minor genital trauma consisting of redness and abrasions on the inner lips of the vagina and several hymenal tears. Examination of G.S., the five-year-old, also revealed minor genital trauma including redness and abrasions on the inner lips of the vagina and hymenal tears. Dr. Hubbard testified that although these physical signs were consistent with sexual abuse, they could also have been caused by other things such as accidents or masturbation.

Debbie Beard, the nurse who examined the girls, was able to question the girls about the cause of the injuries to their genital area. When asked what happened to her, M.S. replied that Junior (Fuentes) had spanked the baby and hit M.S. with a stick on her "front body." When asked what her "front body" was, she indicated her perineal area. She said Fuentes hit her with a stick and his hand. In response to the same questions, G.S. responded that Junior had done "nasty" with her. "Nasty" was the word used by the mother to explain sexual contact to the girls. She also said that Junior touched her "potty" with his hand and his "potty." "Potty" was the word the child used to refer to the genital area. G.S. also related an incident when Fuentes had come into the room where she and M.S. slept and removed his clothes and her clothes and got on top of her in bed. She also said Fuentes had done "nasty" with her before.

Dr. William Kleinpeter, a child psychologist, examined the girls and testified to the emotional and psychological conditions of the girls. He testified that the baby, L.S., was suffering from reactive withdrawal. He said she was not speaking normally for a child of her age, she was lethargic, and did not respond to emotional or social stimuli as a child her age should. He also stated that she was emotionally flat, anxious, fearful, particularly of men, and was actively avoiding growing up. He diagnosed this anxiety as secondary to abuse and neglect.

Dr. Kleinpeter's examination of M.S. revealed that she was functionally retarded due to a lack of teaching and the violence she experienced. He stated that she was overanxious and should be in a healthy environment with emotionally responsive adults.

The doctor's examination of G.S. revealed that she, too, was functionally retarded and undersocialized. He said that she would probably have to repeat kindergarten.

The examination of P.P., the oldest child, revealed that she was functionally retarded, and suffered from depression, free floating anger, fears of abandonment, fears and experiences of abuse, temper tantrums, and bouts of violence. He also stated that P.P. volunteered information about sexual abuse.

The mother provided the only testimony on her behalf. She denied knowledge of any sexual abuse of the girls. In denying Fuentes committed the sexual abuse, she claimed the three-year-old boy she was babysitting had caused the genital trauma suffered by the three younger children. She also admitted that she told a caseworker from the DHS that the eight-year-old daughter had committed the abuse.

The mother also claimed that she had attempted to become a better parent by attending parenting and infant stimulation classes. However, the evidence showed that she was absent from several of these classes. The mother also testified that she contacted Yvonne McMullen, a caseworker from the DHS, about terminating her rights to her children.

■ The evidence in this case which supports the jury findings reflects that the mother had sufficient knowledge of the sexual abuse and that she placed them in surroundings which subjected the children to such abuse. The record is replete with evidence of the sexual abuse endured by the children; not only testimonial evidence in the form of statements made by the children, but also medical evidence. In view of the fact that the eighteen-month-old baby suffered from gonorrhea, the evidence is clear that sexual abuse had been committed and that the mother had knowledge of the abuse, the physical effects of the abuse, and the home environment. Consequently, when we consider the evidence under the applicable standard of review, we must conclude that the evidence is legally sufficient to support the challenged jury findings.

Furthermore, when we consider all of the evidence, including the evidence favorable to the mother, we must conclude that the evidence is factually sufficient to support the challenged jury findings to the effect that the appellant knowingly placed or knowingly allowed each of the children to remain in conditions or surroundings which endangered their physical or emotional well-being. As we stated above, the only evidence favoring the mother's position is her own testimony. In that regard, we acknowledge that she repeatedly denies that Fuentes committed the sexual abuse or that he was even in the home after the children were removed. She denies the medical evidence of sexual abuse, but concedes if there was any abuse, it was committed by her eight-year-old daughter or the three-year-old boy she was attending at the time. However, the mother also concedes that she informally sought termination of her rights from the caseworker for the DHS. Thus, when we consider all of the evidence, there is ample clear and convincing evidence contrary to the mother's position which supports the challenged findings. Appellant's first, second, third, and sixth points of error are overruled.

■ By her fourth point of error, appellant claims the trial court erred in overruling her objection to allowing Eusebio Fuentes to invoke his fifth amendment privilege against self-incrimination in front of the jury when it was known that he would do so, because this violated Rule 513(b) of the Texas Rules of Civil Evidence, in that the record shows that the guardian ad litem for the children called Eusebio Fuentes as a witness. Fuentes testified that he had lived with the mother "off and on" for several months. At the time of trial, he was residing in the Potter County Correctional Center due to violation of his probation. When asked whether he or the mother had gonorrhea, he invoked his fifth amendment privilege against self-incrimination. He also refused to answer a question asking whether he knew the police were looking for him in connection with the sexual abuse of the girls.

Appellant particularly complains of Fuentes invoking the privilege and refusing to answer questions regarding whether he knew L.S., the eighteen-month-old baby, had gonorrhea, whether he was aware the police had accused him of molesting the children, and whether he had gonorrhea. Regarding a witness claiming the privilege, Rule 513(b) of the Texas Rules of Civil Evidence states:

(b) Claiming privilege without knowledge of jury. In jury cases, proceedings shall be conducted, *to the extent practicable,* so as to facilitate the making of claims of privilege without the knowledge of the jury. (emphasis added)

This provision reflects a desire to protect the parties from any adverse inference drawn by the jurors who witness the invocation of the privilege against self-incrimination. "It is reasonable to anticipate that in most instances, planned reliance upon the privilege will be known in advance and the mandate of rule 513(b) can be implemented through the use of motions in limine." Goode and Sharlot, *Article V: Privileges,* Texas Rules of Evidence Handbook, 20 Hous.L.Rev. 273, 396 (1983). A requirement of compliance with the rule presupposes that the party calling the witness knows the witness will invoke the privilege and refuse to answer all or almost all of the questions asked him. *Id.*

First, in this case, although an objection was voiced, no motion in limine was made by appellant to prevent Fuentes from invoking the privilege before the jury. Second, Fuentes answered most of the questions propounded to him. He chose to selectively invoke his privilege against self-incrimination only in response to certain questions. This procedure made invoking the privilege outside the presence of the jury impracticable. Therefore, we find no violation of Rule 513(b) and overrule appellant's fourth point of error.

■ In her fifth point of error, appellant challenges the trial court's action in allowing Debbie Beard, a sexual assault nurse, to testify to statements made by the children during a physical exam by Ms. Beard. Appellant contends that these statements were hearsay and did not fall under the exception in Rule 803(4) of the Texas Rules of Civil Evidence which excepts statements made for purposes of medical diagnosis or treatment from the hearsay exclusion rule.

The statements were made by M.S. and G.S.; the statements by M.S. are as follows:

> She said that when she had gone to visit her mother, that Junior (Fuentes) had been at the house and she said Junior spanked [L.S.] because she was crying. She said Junior hit me with a stick on my front body.
>
> * * * * * *
>
> When I asked her to indicate what her front body was, she pointed to indicate the perineal area. When I questioned her further, she said that Junior touched her in the perineal area with his hand and with a stick.

When asked what G.S. said, Ms. Beard responded:

> She told me that Junior did nasty with her. And that he touched her potty with his hand and with his potty. She related a story to me of Junior coming into where she and [M.S.] sleep, taking off her clothes and removing his own clothes. And getting on top of her on her bed. She also told me that Junior had done nasty with her before.

Appellant objected to the admission of these statements on the grounds that they were hearsay. However, the trial judge allowed the statements into evidence as statements made for purposes of medical purposes after the proper predicate was laid.

Rule 803(4) admits as an exception to the hearsay rule:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Tex.R.Civ.Evid. 803(4). The crucial issue under the rule is whether the out-of-court statement was reasonably pertinent to diagnosis or treatment.

In advancing her fifth point, appellant cites several federal cases which interpret Federal Rule of Evidence 803(4) as disallowing statements which identify the individual who allegedly caused the injuries. However, in interpreting the federal rule, which is identical to the Texas rule, the federal courts rely on the advisory committee note to the rule which states that the cause of an injury is not reasonably pertinent to diagnosis or treatment. This committee note is absent from the Texas rule. Even with this language, the federal courts have held that a statement made by a victim of child abuse identifying the alleged perpetrator is pertinent to both physical and psychological diagnosis and treatment. *United States v. Renville*, 779 F.2d 430, 439 (8th Cir.1985).

In Texas, it has also been held that statements by a victim of child abuse as to the causation and source of the child's injuries are admissible under Texas Rule of Civil Evidence 803(4). *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 680 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). *Ziegler* was also a proceeding to terminate the parental rights of the mother of a child abuse victim. In that case, as in the one before us, the child had been repeatedly abused by men living with the

mother. *Id.* at 678. During the trial of the *Ziegler* case, medical records that contained statements by the child identifying the individual who caused his injuries were introduced into evidence. Appellant objected to the introduction of the records on the basis of hearsay. The court of appeals found that the trial court did not err in admitting the records because the statements as to cause were reasonably pertinent to medical diagnosis and treatment. *Id.* at 680.

In examining the facts before us, we conclude that in the case of a child abuse victim where the cause of the injury is pertinent to both physical and psychological treatment and diagnosis, the statements of the child as to the identity of the abuser are admissible as an exception to the hearsay rule. Appellant's fifth point of error is overruled.

Having overruled appellant's six points of error, we affirm the judgment of the trial court.