NO. 07-04-0102-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



JUNE 30, 2004


______________________________



THE STATE OF TEXAS, 



 Appellant


v.



SANG MINH DOAN, 



 Appellee

_________________________________



FROM THE COUNTY COURT OF LAW NO. 2 OF POTTER COUNTY;



NO. 101,195; HON. PAMELA SIRMON, PRESIDING


_______________________________



Before JOHNSON C.J., and QUINN and CAMPBELL, JJ.

 In this interlocutory appeal, the State claims error on the part of the trial court in
granting Sang Minh Doan's motion to suppress blood test results sought to be used as
evidence. Doan had been charged with driving while intoxicated. Two issues are before
us, and they involve the relevance of the evidence and whether Doan was under arrest at
the time the blood specimen was obtained. We affirm the judgment of the trial court. 

 Background

 On May 20, 2002, an officer was dispatched at 2:30 a.m. to a single vehicle wreck. 
Upon his arrival, he observed a vehicle on its roof. The driver, identified as Doan, was
extracted by rescue personnel and transported to Northwest Texas Hospital. The officer
was not able to interview Doan at the scene but was able to speak with him approximately
an hour later at the hospital. As the officer spoke to him, he observed the odor of alcohol
on Doan's breath and person. Since Doan was on a backboard with a cervical collar, the
officer was unable to perform any field sobriety tests. However, due to the nature of the
accident and the fact he smelled alcohol, the officer allegedly formed a belief that Doan
"possibly was intoxicated," purportedly asked him to consent to a blood test, and
purportedly read to Doan a statutory warning form referred to as "DIC-24." The form, a
copy of which was admitted into evidence, reads in part: "You are under arrest for an
offense arising out of acts alleged to have been committed while you were operating a
motor vehicle . . . in a public place while intoxicated . . . ." The officer also testified that
Doan verbally consented to giving the sample. 

 Though the officer further stated that he intended to arrest Doan when released from
the hospital, his supervisor told him to wait and that an arrest warrant would be issued for
him later. However, in the officer's opinion, appellee "was not free to leave the hospital until
I was instructed to not arrest him by my supervisor."

 Doan filed a motion to suppress alleging that 1) the blood test did not indicate what
his blood alcohol concentration level was at the time he was operating his motor vehicle,
and 2) he was not under arrest when the sample was requested and, thus, no sample could
have been legally obtained from him. After a hearing, the trial court granted the motion
without entering any written findings of fact or conclusions of law. (1)

Issue Two -- Arrest


 In its second issue, the State argues that appellee was under arrest at the time the
blood test was requested and, therefore, Doan had impliedly consented to the test. In view
of this, the trial court allegedly erred in granting the motion to suppress. We overrule the
issue.

 We review a trial court's ruling on a motion to suppress under the standard
announced in Guzman v. State, 955 S.W.2d 85 (Tex. Crim. App. 1997). In doing so, we
give almost total deference to the trial court's finding of historical fact and review de novo 
its application of the law to the facts. Id. at 89.

 Statute permits an officer to obtain a sample of appellee's blood if he was under
arrest when the sampling occurred. Tex. Transp. Code Ann. §724.011(a) (Vernon 1999). 
Both parties agree that the issue before us is whether appellee was under arrest at that
time. 

 A person is arrested when he has been actually placed under restraint or taken into
custody by an officer or a person executing a warrant of arrest or by an officer arresting
without a warrant. Tex. Code Crim. Proc. Ann. art. 15.22 (Vernon 1977). An arrest occurs
at the moment a person's liberty of movement is restricted or restrained. Hoag v. State,
728 S.W.2d 375, 379 (Tex. Crim. App. 1987). The taking of blood is a search and seizure. 
Aliff v. State, 627 S.W.2d 166, 168 (Tex. Crim. App. 1982). A person is seized when, in
view of all the circumstances, a reasonable person would believe that he is not free to
leave. State v. Williams, 814 S.W.2d 256, 259 (Tex. App.-Austin 1991), aff'd, 832 S.W.2d
52 (Tex. Crim. App. 1992). An officer's opinion that a person has been arrested is one
factor to be considered. Hoag v. State, 728 S.W.2d at 378-79. 

 The officer who allegedly spoke with Doan at the hospital was the only witness at
the suppression hearing. As noted above, he purported to read the statutory warning which
informed appellee he was under arrest and also stated that Doan was not free to leave at
the time the test was conducted. It was only later that his supervisor allegedly informed
him that Doan would be arrested by warrant issued later. This was evidence that would
permit a reasonable person in Doan's position to believe he was not free to leave and,
therefore, under arrest. See Garcia v. State, No. 07-99-210-CR (Tex. App.-Amarillo June
2, 2000, pet. ref'd) (unpublished) (recognizing that the reading of a DIC-24 form to the
suspect was an indicia illustrating that the suspect was under arrest); Nottingham v. State,
908 S.W.2d 585, 588 (Tex. App.-Austin 1995, no pet.) (holding that the defendant was
arrested at the time the officer told her pursuant to the DIC-24 warnings she was under
arrest because a reasonable person in her position would believe she was not free to
leave); Bell v. State, 881 S.W.2d 794, 799-80 (Tex. App.-Houston [14th Dist.] 1994, pet.
ref'd) (holding there was some evidence that defendant was under arrest when the DIC-24
warnings were read to him). (2) 

 Nevertheless, we are unable to hold that the trial court abused its discretion in
granting the motion to suppress. As disclosed by comments made at the suppression
hearing, the trial court questioned whether or not appellee was under arrest and whether
the implied consent encompassed by the statute arose only upon arrest. Moreover, the
Court of Criminal Appeals has stated that the factfinder, i.e. the trial court here, may reject
the officer's testimony about what occurred and what was said, even if uncontested. Ross
v. State, 32 S.W.3d 853, 856-57 (Tex. Crim. App. 2000). 

 In the absence of written findings of fact by the trial court, the general rule is that a
reviewing court cannot hold that the trial court abused its discretion by granting a motion
to suppress. State v. Guo, 64 S.W.3d 662, 666-67 (Tex. App.-Houston [1st Dist.] 2001, no
pet.). So, given this, the standard of review, and the trial court's authority to reject the only
testimony purporting to illustrate that appellee was under arrest, we cannot say that its
decision was an abuse of discretion. 

 Having overruled issue two, we need not decide issue one. If the evidence was
improperly obtained, then it does not matter whether it would be relevant. Accordingly, the
judgment of the trial court is affirmed.


 Brian Quinn

 Justice 

Do not publish. 

1. At the hearing, the court indicated that the question of whether appellee had been arrested had not
really been answered. 
2. Doan cites to Combest v. State, 981 S.W.2d 958, 960 (Tex. App.-Austin 1998, pet. ref'd) in support
of his position. However, in that case, both parties agreed that Combest was not under arrest at the time he
impliedly consented to the blood test.


did not use it. She continued to deny any abuse towards herself or her
children. She also stated that D.J. did not have any sexual perversions. Prior to giving her
third statement on April 16, 2007, Officer Smith spoke with T.W. and she admitted that
domestic violence had occurred and she had seen a handprint on D.R.J.’s face while he
was in D.J.’s sole care. She claimed that D.J. would get upset when D.R.J. cried. 
          As a result of Q.M.J.’s death, the Texas Department of Family and Protective
Services removed D.R.J. from his home and filed its petition seeking to be named
temporary sole managing conservator of D.R.J. and ultimately, termination of T.W. and
D.J.’s parental rights. Initially, the Department’s goal was family reunification; however, the
goal later changed to alternative family placement, i.e., adoption. D.J. signed an affidavit
of voluntary relinquishment of his parental rights and the termination suit proceeded
against T.W. The Department sought termination against T.W. for one or more of the
following acts or omissions:
(1) knowingly placing or knowingly allowing the child to remain in conditions
or surroundings which endangered the physical or emotional well-being of
the child;
(2) engaging in conduct or knowingly placing the child with persons who
engaged in conduct which endangered the physical or emotional well-being
of the child. 
 
See Tex. Fam. Code Ann. § 161.001(1)(D) and (E) (Vernon 2008).


 
          At the final hearing, the Department presented testimony from thirteen witnesses,
including T.W. The trial court then ordered termination of T.W.’s parental rights. The trial
court further ordered that T.W. have limited access to and possession of D.R.J. in the form
of supervised visitation. After numerous home studies, D.R.J. was eventually placed with
his maternal great uncle who wishes to adopt him. The uncle is not opposed to T.W.
having contact with D.R.J.
Termination of Parental Rights
          The natural right existing between parents and their children is of constitutional
dimension. See Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). See also Santosky v.
Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Consequently,
termination proceedings must be strictly scrutinized. In the Interest of G.M., 596 S.W.2d
846, 846 (Tex. 1980). Parental rights, however, are not absolute, and it is essential that
the emotional and physical interests of the child not be sacrificed merely to preserve those
rights. In re C.H., 89 S.W.3d 17, 26 (Tex. 2002). 
          A termination decree is complete, final, irrevocable, and divests for all time that
natural right as well as all legal rights, privileges, duties, and powers with respect to each
other except for the child’s right to inherit. Holick, 685 S.W.2d at 20. Thus, due process
requires application of the clear and convincing standard of proof in cases involving
involuntary termination of parental rights. In the Interest of J.F.C., A.B.C., and M.B.C., 96
S.W.3d 256, 263 (Tex. 2002). Clear and convincing evidence is that measure or degree
of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established. See § 101.007. See also In the Interest
of G.M., 596 S.W.2d at 847; In the Interest of Z.J., 153 S.W.3d 535, 539
(Tex.App.–Amarillo 2004, no pet.).
          The Family Code permits a court to order termination of parental rights if the
petitioner establishes one or more acts or omissions enumerated under subsection (1) of
the statute and also proves that termination of the parent-child relationship is in the best
interest of the child. See § 161.001; Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). 
Though the same evidence may be probative of both issues, both elements must be
established and proof of one element does not relieve the petitioner of the burden of
proving the other. See Holley, 544 S.W.2d at 370; In re C.H., 89 S.W.3d at 28. 
 
Termination of Parental Rights Under § 161.001(1)(D) & (E)
          Under section 161.001(1)(D), parental rights may be terminated when clear and
convincing evidence shows that a parent knowingly placed or knowingly allowed her child
to remain in conditions or surroundings that endanger the physical or emotional well-being
of the child. Although the focus of subsection (D) is on the child’s living environment and
not on the parent’s conduct, parental conduct may produce an endangering “environment.”
See In re D.T., 34 S.W.3d 625, 633 (Tex.App.–Fort Worth 2000, pet. denied). See also
Matter of B.R., 822 S.W.2d 103, 105-06 (Tex.App.–Tyler 1991, writ denied)


 (citing In the
Interest of L.S., P.P., G.S., and M.S., 748 S.W.2d 571 (Tex.App.–Amarillo 1988, no writ). 
Additionally, subsection (D) permits termination based on a single act or omission by the
parent. In re L.C., 145 S.W.3d 790, 796 (Tex.App.–Texarkana 2004, no pet.).  
          Under section 161.001(1)(E), parental rights may be terminated if clear and
convincing evidence shows that a parent engaged in conduct or knowingly placed her child
with persons who engaged in conduct that endangered the child’s physical or emotional
well-being. This inquiry focuses on conduct of the parent or a person with whom the parent
has placed the children. In re L.C., 145 S.W.3d at 797. Additionally, the evidence under
subsection (E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious “course of conduct” by the parent is required. Id. Under
subsection (E) we look not only at evidence regarding the parent’s active conduct, but also
evidence showing the parent’s omissions or failures to act. Id. 
          “Endanger” means more than a threat of metaphysical injury or the possible ill
effects of a less-than-ideal family environment. In re M.C., 917 S.W.2d 268, 269 (Tex.
1996), (citing Tex. Dep’t of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987)). 
See also In re T.N., 180 S.W.3d 376, 383 (Tex.App.–Amarillo 2003, no pet.). To
“endanger” includes exposure to loss or injury; thus, surroundings can endanger the well-being of a child without the child suffering actual physical injury. In re L.C., 145 S.W.3d at
796.
Best Interest of the Child Under § 161.001(2)
          To determine the best interest of the child, we apply a non-exhaustive list of
considerations. See Holley, 544 S.W.2d at 371-72. They include the desires of the child,
the emotional and physical needs of the child now and in the future, the emotional and
physical danger to the child now and in the future, the parental abilities of the individuals
involved, the programs available to those individuals to promote the best interest of the
child, the plans for the child by these individuals, the stability of the home, the acts or
omissions of the parent which may indicate that the existing parent-child relationship is not
proper, and any excuse for the acts or omissions of the parent. Id.
 
Standard of Review–Sufficiency of the Evidence
          In reviewing the legal sufficiency of the evidence to support an order terminating
parental rights, a court should look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true. In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005) (citing
In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002)). To give appropriate deference to the
factfinder’s conclusions and the role of a court conducting a legal sufficiency review,
looking at the evidence in the light most favorable to the judgment means that a reviewing
court must assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. In re J.F.C., 96 S.W.3d at 266. A corollary to this
requirement is that a court should disregard all evidence that a reasonable factfinder could
have disbelieved or found to have been incredible. Id. This does not mean that a court
must disregard all evidence that does not support the finding. Id. (Emphasis in original). 
Disregarding undisputed facts that do not support the finding could skew the analysis of
whether there is clear and convincing evidence. Id. Thus, in conducting a legal sufficiency
review in a parental termination case, we must consider all the evidence, not just that
evidence which favors the verdict. See City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex.
2005) (Emphasis in original).
          The standard for reviewing the factual sufficiency of termination findings is whether
the evidence is such that a factfinder could reasonably form a firm belief or conviction
about the truth of the Department's allegations. In re C.H., 89 S.W.3d at 25. Under that
standard, we consider whether the disputed evidence is such that a reasonable factfinder
could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96
S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant that a factfinder
could not reasonably have formed a firm belief or conviction, then the evidence is factually
insufficient. Id. 
          Only one statutory ground is required to terminate parental rights under section
161.001(1). See In re S.F., 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.). 
Therefore, we will affirm the termination order if the evidence is sufficient on any statutory
ground upon which the trial court relied in terminating the parent-child relationship. See
id.
Sufficiency of the Evidence for Termination Under § 161.001(1)(D) & (E)
          In support of her sufficiency of the evidence argument, Appellant maintains that her
knowledge of undesirable facts about D.J. did not rise to the level necessary to establish
that she “endangered” D.R.J. Appellant cites, among other cases, In re C.J.F., 134 S.W.3d
343 (Tex.App.–Amarillo 2003, pet. denied), in support of her argument. In In re C.J.F., this
Court affirmed termination of parental rights of the child’s biological parents finding they
had endangered the child’s physical or emotional well-being. Id. at 351. As in the
underlying case, the father had been accused of injuring and killing a young sibling. Expert
testimony indicated that the deceased child had suffered multiple injuries to his body,
especially his head. Id. at 349. The evidence established a pattern of physical abuse by
the father against the mother and also against the deceased child. Both parents were also
drug abusers. In affirming the termination of the mother’s parental rights, we concluded
that “the singular fact that [the mother] allowed [the deceased child] to remain unattended
in the company of one she knew had abused him in the past provide[d] a basis for
termination under subsection (E).” Id. at 353. 
          In distinguishing C.J.F., T.W. argues there was no sign of an ongoing pattern of
abuse of her children by D.J. She asserts that her knowledge of (1) D.J. pushing and
slapping her on two occasions in 2006, (2) a handprint on D.R.J.’s face on one occasion
while in D.J.’s sole care, and (3) D.J.’s use of marihuana and cocaine dealing outside the
children’s presence is not legally nor factually sufficient conduct establishing endangerment
of her children. With this, we disagree. 
          T.W. had fifteen sessions with therapist Darren Snyder from May 29, 2007, to
November 26, 2007, to explore a history of violent relationships, unresolved grief,
unresolved anger, lack of insight, and lack of job skills. Although Snyder did not testify, his
reports were introduced into evidence through therapist Leta Acker, custodian of the
records. Snyder’s notes reflected that T.W. would need more therapy to make “positive
lasting changes for herself and her young son.”
          T.W. was referred by Child Protective Services to Dr. Priscilla Kleinpeter, a family
therapist, for a psychological evaluation on June 6, 2007, approximately two months after
Q.M.J.’s death. Dr. Kleinpeter testified that the evaluation consisted of a clinical interview,
mental status exam, assessment of academic achievement, and personality evaluation. 
According to Dr. Kleinpeter’s testimony, T.W. indicated that D.J. had physically abused her
on several occasions, associated with drug dealers, and she was aware that D.J. was
using drugs, particularly cocaine. T.W. and D.J. separated several times due to D.J.’s drug
use, abuse, irritability, anger, and failure to hold a job. T.W. explained that, to her
disapproval, D.J. disciplined D.R.J. by thumping him on the head; however, she believed
D.J. to be a good and patient father. 
          Dr. Kleinpeter described T.W. as guided by “fear of criticism, rejection, and
disapproval,” which she avoids by “appearing weak, accommodating, overly respectful, and
solicitous.” Her submissiveness causes her to be “easily dominated, influenced, and
abused.” She is “overhopeful of change” and believes in “magical solutions to problems.” 
Dr. Kleinpeter diagnosed her with an anxiety disorder and a personality disorder with
dependent and paranoid features. 
          Dr. Kleinpeter testified that notwithstanding T.W.’s therapy from June 2007 through
September 2008, she had not changed and still posed a risk to D.R.J. According to Dr.
Kleinpeter, T.W. did not make good decisions as a parent by leaving her children with their
father as the sole caregiver knowing his tendencies to be abusive and use and sell drugs. 
T.W.’s personality characteristics placed her at risk of allowing abuse of her child. Her
personality characteristics were part of a long standing pattern that would require long term
treatment and be slow to change.
          Dr. Edward Basham, a psychologist who evaluated T.W. after a year and a half of
sessions with several therapists, testified that T.W. is an insecure individual with an I.Q.
of 75 and borderline intellectual functioning. He added that all her therapy had not made
the slightest impact on her ability to independently care for D.R.J. Services would not
change her personality nor raise her I.Q. According to Dr. Basham, T.W. has weak
parenting skills and a personality that draws her to persons who are controlling and
dominating. She also has weak verbal skills, poor judgment, lack of sensitivity, and lack
of concern. In assessing her parenting skills, he provided that T.W. “is at risk to place her
children in risky and neglectful circumstances. [T.W.] appears unable to evaluate the risk
that other people may present for her children.” Although Dr. Basham concluded that
parenting classes would be helpful, he recommended regular outside help for T.W. to
“function as an effective parent.” 
          Dr. Basham also testified that T.W. denied any domestic violence but admitted D.J.
pushed her at times. He described her as defensive in her manner with “blanket denials
about [there] being no problems.” As an illustration, he testified that T.W. has never had
a driver’s license and has received numerous tickets which remained unpaid; yet, she
continues to drive not realizing the solution is to obtain a driver’s license. Dr. Basham gave
a guarded prognosis that completion of services would not make a substantial difference
in improving T.W.’s parenting skills.
          Lynn Jennings, a counselor, treated T.W. from December 2007 through September
2008, for relationship issues, specifically, how to avoid future abusive relationships. During
her testimony, she expressed her surprise to learn that T.W. had not been honest during
her sessions about D.J.’s prior abuse and drug dealing which came to light during other
expert witnesses’ testimony. She also learned that T.W. had failed to mention she had
seen a handprint on D.R.J.’s face just weeks before Q.M.J.’s death.
          Before the revelations at trial and an examination of Dr. Basham’s report, Jennings
believed that T.W. was benefitting from her therapy sessions. She expressed the
undesirability and hopelessness of terminating T.W.’s parental rights. However, after
learning new information, she was concerned about T.W.’s lack of honesty during her
sessions. She worried about T.W.’s judgment in leaving her children under the supervision
of their father. 
          T.W. offered telling evidence against herself. When questioned, her answers
showed that she knew D.J. used marihuana and used and sold cocaine. Although she
testified that D.J. did not use or sell drugs around her children, laboratory results
introduced into evidence showed that D.R.J. tested positive for cocaine. The laboratory
employee who testified explained that the hair test result of 2201 pg/mg for D.R.J.
indicated that for a child to have that result “it would take some exposure on a regular to
daily basis to reach a point that even exceeds a positive ratio.” According to T.W., D.J.
was selling cocaine outside the home and she was unaware that D.R.J. had been exposed
to cocaine. She conceded that it was not a good parenting skill to leave her children with
someone who might put them in danger by selling cocaine.
          T.W. also testified that she and D.J. were involved in a “few physical altercations.” 
She testified that she left him several times not because she felt she was in danger, but
to avoid arguing and fighting.
          During her psychological evaluation with Dr. Basham, T.W. gave him a history of her
relationship with D.J. According to Dr. Basham’s report, D.J. left T.W. in 2004 after
learning she was pregnant. D.J. moved in with another woman and her child. During that
time, D.J. was accused of burning the other woman’s child with a cigarette. The report
provides, “[T.W.] says that these charges were dropped, [D.J.] and the child’s mother
denied that [D.J.] was responsible, and [T.W.] gave little further thought to the matter.” 
          Evidence was presented that T.W. is not a bad person. Her drug tests were always
negative. Her mother testified that she has always maintained employment and kept a
clean home. According to the Department’s progress reports, T.W. complied with the
Department’s Family Service Plan and visited with D.R.J. as permitted by the Department. 
She also completed a sexual abuse education class, parenting classes, and a Family Crisis
Resolution Program. The Department was concerned, however, after reviewing T.W.’s
sexual abuse education class course work, that she did not acknowledge or understand
the severity of the case. 
          T.W. testified that she is focusing on herself and her son and is more independent. 
She testified that she can recognize the signs of a bad relationship and avoid one in the
future. She is working, has a nice home, and is planning on obtaining a general
equivalency diploma. She acknowledged her prior mistakes and claimed to be making
better decisions and having better judgment. 
          When questioned by the Department’s counsel, T.W. admitted that around
Christmas 2006, D.J. hurt her and she left him. T.W. conceded that D.J. was violent, used
drugs, and sold cocaine. However, she was comfortable leaving her children with D.J. as
the primary caregiver because he was their father and she did not believe he would hurt
them. However, she testified that when she noticed a handprint on D.R.J.’s face, she
assumed D.J. had hit D.R.J. T.W. expressed her hope that D.J. would change but
acknowledged that was not enough and she did not take any steps to protect her children. 
          The need for permanence is a paramount consideration for a child’s present and
future physical and emotional needs. In re M.A.M.M., 75 S.W.3d 73, 77 (Tex.App.–San
Antonio 2002, no pet.). The expert testimony and evidence showed that T.W. had
consulted several therapists and a psychologist for a year and a half. The gist of their
testimony is that therapy has had little or no impact on T.W.’s outlook as a mother. Dr.
Kleinpeter testified that past behavior is a predictor of future behavior. There was also
testimony that T.W. would require long term therapy to cope with her personality
characteristics. D.R.J. needs permanence and does not have the luxury of time.
          T.W. has already lost one child and failed to protect D.R.J. from exposure to
cocaine. T.W.’s knowledge of D.J.’s unlawful and abusive conduct inherently created
conditions or surroundings which endangered the physical or emotional well-being of her
children to support termination under section 161.001(1)(D). In re B.R., 822 S.W.2d at
106. Additionally, T.W. engaged in a voluntary, deliberate, and conscious “course of
conduct” that supports the court’s finding under section 161.001(1)(E). Her knowledge of
D.J.’s abusive conduct and drug dealing placed her children in the care of someone who
engaged in conduct which endangered their physical or emotional well-being. We
conclude the evidence is legally and factually sufficient to support termination of T.W.’s
parental rights to D.R.J. under section 161.001(1)(D) and (E). Issue one is overruled.
Sufficiency of the Evidence to Support Best Interest Finding
          We acknowledge there is a strong presumption that a child’s best interest is usually
served by awarding custody to the natural parents. In re V.L.K., 24 S.W.3d 338, 341 (Tex.
2000). However, we find the evidence described above successfully rebuts that
presumption and there is little evidence that is so significant that a reasonable trier of fact
could not have reconciled that evidence in favor of its finding that termination of T.W.’s
parental rights was in D.R.J.’s best interest. 
          In reviewing D.R.J.’s best interests, we are guided by the Holley factors. 544
S.W.2d at 371-72. D.R.J.’s desires were not made known during the hearing. However,
he is living with his maternal great uncle and his family and according to the evidence, is
adapting well. Although T.W.’s mother expressed her desire that D.R.J. be returned to
T.W., she testified that D.R.J. is living in a safe, stable, environment. Lynn Jennings
testified that although she “hate[s] to see the rights of [T.W.] terminated,” it was her
understanding from reports that D.R.J. is “secure and happy and is growing and developing
well.”
          T.W. testified that it is in D.R.J.’s best interest to be with her. There was also
evidence that T.W. complied with all the Department’s requests and services. However,
a parent’s compliance does not preclude a finding that termination is in a child’s best
interest. See In re A.C.B., 198 S.W.3d 294, 298 (Tex.App.–Amarillo 2006, no pet.). Erin
Moorman, D.R.J.’s caseworker, testified that termination of T.W.’s parental rights is in
D.R.J.’s best interest so that he can be adopted by his maternal uncle and have
permanency and “added perks.” Although T.W. completed the Department’s services, she
was also required to make adequate progress before D.R.J. could be placed with her. 
According to Moorman, T.W.’s lack of honesty during her treatment and services hindered
her progress and the Department did not believe she could provide a safe placement for
D.R.J. If adopted, D.R.J. would be entitled to a subsidy for his care, Medicaid until age
eighteen, and college tuition. Moorman added that D.R.J. is bonding with his maternal
uncle and his family and they have moved into a larger home. The maternal uncle is also
willing to allow T.W. to have supervised contact with D.R.J. Applying the Holley factors,
we conclude the trial court’s finding that termination of T.W.’s parental rights to D.R.J is in
his best interest. Issue two is overruled.
          Accordingly, the trial court’s order is affirmed.
 
                                                                          Patrick A. Pirtle

                                                                                 Justice