

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00504-CV

IN THE INTEREST OF A.W. AND
H.W., JR., CHILDREN

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In two issues, Mother contends that the evidence is factually insufficient to support the trial court's findings that her parental rights to A.W. and H.W. should be terminated under subsections D and E of section 161.001(1) of the family code. Tex. Fam. Code Ann. § 161.001(D), (E) (West Supp. 2012). We affirm.

**Factual Sufficiency of Evidence Supporting Endangerment Findings**

The trial court found that Mother "knowingly placed or knowingly allowed the [c]hildren to remain in conditions or surroundings which endanger the

---

[1]*See* Tex. R. App. P. 47.4.

physical or emotional well-being of the [c]hildren" and "engaged in conduct or knowingly placed the [c]hildren with persons who engaged in conduct which endangers the physical or emotional well-being of the [c]hildren." *See id.*

## A. Applicable Law

Endangerment is defined as exposing to loss or injury, to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *See In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) (stating that "environment" refers not only to the acceptability of living conditions but also to a parent's conduct in the home).

2

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, nor is the child required to suffer injury. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *Id.*

## B. Evidence

### 1. 2006 Incident

In December 2006, a Department of Family and Protective Services (Department) investigator was called to the children's daycare; she saw that H.W. had extensive bruising and lacerations. During her investigation of the injuries, the children's father (Father) admitted "los[ing] it" and hitting H.W. with a studded belt. Mother told the investigator that she had to go and ask Father to stop spanking H.W. Mother knew that father spanked the two- and three-year-old children for discipline, and Father said he also made them stand in the corner holding their hands up as discipline.

3

The investigator did not remove the children from the home, but she did prepare a family service plan. Mother and Father agreed to a temporary voluntary placement for the children with family friends. Father completed parenting classes, the children returned to the home, and Mother told the Department she would be protecting H.W. The Department then closed the case. Father pled guilty to injury to a child and received ten years' probation.

### 2. 2010 Incident

An elementary school nurse testified that in February 2010, the counselor brought H.W. to her; she observed bruises on his face and behind his ear. H.W. told her he had been dragged on the carpet and pushed onto the couch by Father. Photographs of the marks and bruises on his face were admitted into evidence. The bruising was visible, and he had carpet burns on his head. H.W. told the counselor that he had gotten a behavior mark in Kindergarten the day before; Father got angry with him, grabbed him, and dragged him across the floor, causing him to hit a table or piece of furniture. He had marks "all the way from under his eye to almost his ear and well up into his hairline."

The CPS investigator who was called to the elementary school saw a bruise on H.W.'s leg and bruising and red marks on his wrist area. H.W. told the investigator that Father was typically home when the kids got home from school on the bus, and he took care of them until Mother got home from work. He also told her that, typically, when he got in trouble Father would slap or "whoop" him, or he would have to stand in a corner. Mother sometimes "whooped" him too.

4

He was "whooped" with either a hand or belt. He told her that he came home with a sad face on his folder and that Father started yelling at him, grabbed him by the head, slapped him, knocked him to the floor, grabbed him by the leg, dragged him across the floor, picked him up by the neck, and shoved him into the corner. His head hit the wall. He had to stand in the corner a long time before he could go to his room. H.W. told her that Father had left marks on him before. Mother was not there, and H.W. went to bed before Mother came home.

A.W., who was seven-years-old when she was interviewed, corroborated what had happened. She said Mother was not home, that H.W. was often slapped or "whooped," but that she had never seen marks before.

Father not only denied the specific incident, he denied that he ever physically disciplined H.W. He said the marks and bruising could have come from haircuts or the kids playing.

When the investigator confronted Mother with what had happened, Mother said that she did not believe at all that Father had done that to H.W. and that he could never do that. She said H.W. bruised easily when playing and that the children were probably roughhousing. Mother also said that the original charges against Father in 2006 were "trumped up." Because Mother was not cooperative with ideas for a voluntary placement, CPS removed the children.

Father told a Fort Worth Police Department detective that he had disciplined H.W. for being in trouble at school by spanking him on the hand with a

5

ruler[2] and "guid[ing]" him to the corner, where he fell. According to Father, the marks on H.W. could have been made by H.W.'s scraping against a tree plant in the house while Father was guiding H.W. to the corner. Father denied the children's accounts of the incident, and he stated that the marks on H.W.'s head came from a haircut. Father told the detective that he was a truck driver, that he left the house every morning around 4:00 a.m. to drive to Houston and back, and that he was home by the afternoon. Father said that on the morning of February 19, 2010, he called Mother and told her not to let H.W. go to school if he had marks on him.

The children told the detective what they had told CPS: that Father had dragged H.W., leaving the marks on his face. A.W. also told the detective that their older sister had placed cold compresses on H.W.'s face that night to ease the swelling.

The detective did not interview Mother, and he did not believe Father's explanation about the incident.

In August 2010, Mother filed a motion to modify the temporary orders then in place, contending that she had completed all of her services and that she had separated from Father, who was no longer living in the home. The trial court ordered the children returned to Mother as a temporary possessory conservator under the supervision of the Department as temporary managing conservator.

[2]Father told the detective that he typically disciplined the children by spanking them on the hand with a ruler.

6

The monitored return order allowed Father "reasonable supervised visitation and access to the [c]hildren" through the Department but also ordered Mother not to allow Father to have "any contact" with the children.

### 3. 2011 Incident

One of A.W.'s teachers testified that her behavior was good until December 2010, when she noticed her behavior changing for the worse. When the teacher called Mother, Mother stated that that A.W.'s behavioral change was due to all the CPS visits at the school. In January 27, 2011, the trial court removed the Department as temporary managing conservator and named Mother managing conservator; it also ordered that all visits between Father and the children were to be through Family Court Services. CPS stopped visiting the school, but A.W. continued to have behavior problems. A.W. started going to counseling with the school counselor. In the spring, A.W. began saying things to her teacher that made it sound as if Father was living with the family again. One day, A.W. nervously asked the teacher to sign her communication folder because Father would not believe she had a good day if the teacher did not sign it; when the teacher asked if A.W. was visiting Father, she said that he was just at home. The teacher saw a bruise on the back of A.W.'s knee on May 31, 2011; it was very dark. A.W. said she did not know what had happened. The teacher did not believe her, and called CPS to report it.[3]

---

[3]A.W. never said anything to her teacher about Mother harming her.

7

The CPS investigator of the February 2010 incident saw the children in the CPS office in early June 2011; she noticed a bruise on the back of A.W.'s leg, behind her knee area. A.W. told the investigator that she and H.W. were eating breakfast and getting ready for school when Father got mad because they were watching TV. He struck a belt at the chair where she was sitting and it "inadvertently" hit her. Mother was upstairs. A.W. started crying, but when Mother came downstairs, she never asked A.W. why she was crying. A.W. told the investigator that Father was not supposed to be in the house at the time. The Department removed the children again.

Gary Hill, a special investigator with CPS testified that he watched the house at Mother's address one afternoon and evening; Father drove up in a red truck, the garage door opened remotely, and he went inside and stayed.

Father was convicted of the February 2010 offense against H.W. and the June 2011 offense against A.W. and sentenced to six years in prison.

### 4. Mother's Testimony

Mother testified that at the time of trial she had filed for divorce, but it was not final. She denied ever physically disciplining her children and said she did not believe in physical discipline. She also said Father did not physically discipline H.W. and that she had never seen him do it. However, Mother also said that she believed Father started spanking A.W. when A.W. was seven or eight years old.

Referring to the 2006 incident, Mother testified that Father lost control when hitting H.W. because the then-two-year-old had defecated on himself. Mother agreed that Father had engaged in extreme physical abuse. Although Mother had testified in a prior hearing that she did not think Father had hurt H.W. in 2006, she testified at the termination trial that "[t]he reason my testimony is different today is because of the judge giving me the opportunity to get a clear definition of what child abuse is." She said she had learned the definition that year in a class at the Parenting Center.

Mother admitted that during the 2006 incident she had watched what was happening for a couple of minutes before she tried to put a stop to it. Father told Mother that he had learned at the parenting class on positive discipline that he took after the 2006 removal that spanking the children with a ruler was acceptable discipline. She just assumed such discipline was acceptable. When Father was put on probation after the 2006 incident, Mother and Father did not tell anyone, including their families, with whom they had frequent contact.

Mother agreed that she had failed to protect H.W. in 2010. She nevertheless said that she learned at that point that she needed to protect her children at all costs. Father told Mother he had spanked H.W. with a ruler in the 2010 incident, but she found out at a hearing what had really happened.

Mother testified that at first, she did not believe H.W.'s explanation about what happened to him in 2010; she did not believe it until two or three months

9

before trial.[4]  She admitted lying to CPS about Father's not being in the home during the monitored return until CPS closed the 2010 case in January 2011. She stated that during that monitored return, Father stayed in the home two or three times a week and saw the children, despite being ordered not to do so. Mother also admitted lying to the court during that case; despite the monitored return order's strict guidelines as to how Father could visit the children, he moved back in the house in February or March 2011.[5]

On June 3, 2011, Father called Mother and told her CPS had showed up at the house and that she needed to come home.  Mother assumed her older daughter was there at the time because she had left A.W. and H.W. with her.[6] Father told Mother that he had told the CPS investigator that the children were in daycare at the time when they were not.  Mother called her older daughter and told her to bring the children to her at work; Mother contends that she did not find out until later that her daughter was not home at the time.  Mother's daughter picked up the children and headed for Mother's work; the police and the CPS

---

[4]Mother also testified that she saw H.W. in the light before he went to school; she said he had no marks on him at that time and that the marks had not yet manifested themselves.

[5]Mother admitted she violated the August 2010 and January 2011 orders providing for only supervised visits with Father.

[6]Although Mother "left" the children with her eighteen-year-old daughter, Mother knew Father was still there; Mother testified that she was not scared to leave him home alone with the children even though she did not.  Mother knew that CPS could catch Father at the house and that she "was taking a chance in doing it."

investigator followed the daughter and pulled her over in North Richland Hills. Mother met them at a gas station.

Regarding the 2011 incident, Mother testified, "I know [Father] had the belt in his hand. And he aimed at the chair or the table where they were -- in between the two kids where they were standing and didn't realize that the belt had, as far as, touched [A.W.], you know, had hit her." According to Mother, Father did this because the children were not listening and were watching TV instead of getting ready for school.[7] Mother reluctantly admitted that based on Father's history, it was possible he could spank a child who failed to obey him. However, she also contended that she was not aware that Father had spanked either child after August 31, 2010.

Mother said that she believed Father's versions of events until July or August of 2011, when her children went back into foster care. But she also admitted that at a probation revocation hearing for Father in April 2012, she had testified that she still did not believe that Father hurt the children. Mother also testified at that hearing that she did not see anything dangerous in Father and that she did not think he was abusive towards the children and would not think so regardless of how many probations or pending injury to a child cases he had. She explained at the termination trial that she believed that statement to be true at the time of the revocation hearing. According to Mother, the parenting class

_____

[7]She was at home upstairs when the belt incident with A.W. happened; Father told her it was an accident.

11

she took about two or three months before trial changed her mind. But she also agreed that she had already taken a parenting class after the 2010 removal.

Mother said that although she had testified at least twice before that she would keep her children safe from Father, she really would this time, even after his release from prison, because now she understood what abuse is and how to recognize it. According to Mother, she lied at Father's probation revocation hearing because she wanted to help him.

According to Mother, Father had signed a final decree in their divorce proceeding, but she still needed to give the trial court "additional information." Mother denied having contact with Father since his incarceration in April 2012. But she was impeached with evidence that she had visited Father twenty-five times between April 20 and May 31, 2012.

Mother admitted that it would be reasonable to assume that Father would be at the house on June 3, 2011 because he had a garage remote and a key and could come and go as he pleased. She also admitted that when Father was "around," he was active in the children's lives and that he was at the house "quite often." She agreed that each time her children were returned from the Department, she let Father harm them.

### 5. The Counselors' Testimony

Dr. Parnell Ryan, a psychologist who examined Mother after the February 2010 removal, testified that Mother told him she did see something on H.W.'s face before he went to school the day the teacher observed the marks on his

12

face and bruising. According to Dr. Ryan, Mother saw herself as a victim of circumstances and that she perceived what was going on as something happening to her. The children's counselor, Morris Lackey, said the children had no fear of Mother and had never said that Mother had abused them. A.W. had made it clear to Lackey that she would not report any future abuse by an adult; he thought this was because of the trauma she experienced from the removals. H.W. told him, "My daddy would whip me when I was bad." H.W. expressed fear about being returned to a situation where Father would be present. A.W. said Father hit her but not to the extent he hit H.W. because H.W.'s behavior was worse.

### 6. Caseworker's Testimony

Rita Thompson, the children's caseworker for the 2010 and 2011 removals, testified that during the 2010 case, at the conclusion of a family group conference, she told Mother that there would come a time when she had to decide between her children and her husband, and Mother told her that she "would not make that decision." Although Mother participated in her services during that removal, Father did not. The Department opposed reunification after the 2010 incident even though the trial court had ordered it because the Department did not think Mother had "acknowledged the abuse that her children had sustained and agreed to fully keep them safe from" Father. Thompson had frequent contact with Mother before the children were returned to her in January 2011, and Mother "was . . . consistent in her stance on remaining in a

13

relationship with" Father. Thompson thought that the children were hiding something before the 2010 case was closed in January 2011 and that A.W. had seemed to put pressure on H.W. not to be honest with Thompson. Father did not participate in services during the 2011 case either. According to Thompson, the first time Mother admitted that Father had injured, abused, or neglected the children was in her trial testimony.

After the 2011 removal, Thompson was concerned about the weekend visits that occurred because when she, Mother, and Father met with the children, Father was very familiar with the house—for instance, what was in the refrigerator—and it appeared Mother and Father were lying when they said Father would not be there. Thompson stopped the weekend visits when Mother testified in Father's criminal trial that she did not believe Father was a danger to her children. Thompson stated that Mother's honesty had been an issue throughout the case.

## C. Analysis

Mother contends that the evidence is factually insufficient to prove (D) or (E) grounds because the evidence shows that she did not knowingly leave the children with Father, that it was not commonplace for the children to be left with Father, and that on the day of the last incident, she had left the children with her older daughter. But there is evidence from which a factfinder could determine that Mother knew of Father's violent propensity toward H.W. and nevertheless failed to protect both children from his abusive anger. Although Father was on

14

probation for injury to child—and although the family had already endured two Department investigations for his actions—Mother allowed him to live in the home, knowing that he would spend a significant amount of time with the children. A factfinder could reasonably form a firm conviction or belief that Mother's eighteen-year-old daughter would not be able to protect the children from Father, and that Mother was aware that her daughter would not be able to do so; Mother herself had not been able to prevent the abuse in the past and could not reasonably have expected that Father would never have an opportunity to be alone with the children while living in the home.

A factfinder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent. *In re J.I.*, No. 02-04-00299-CV, 2005 WL 1047891, at *11 (Tex. App.—Fort Worth May 5, 2005, no pet.) (mem. op.). We conclude and hold that there is sufficient evidence from which a factfinder could reasonably conclude that Mother was well aware of Father's propensity to lose control when disciplining the children and that she nevertheless continued to allow him access to them. *See, e.g.*, *In re L.S.*, 748 S.W.2d 571, 574–75 (Tex. App.—Amarillo 1988, no pet.) (holding evidence factually sufficient even though mother denied sexual abuse of children occurred when medical evidence of such abuse existed). That Mother may not have thought Father's "overdiscipline" of the children was abusive conduct does not change our analysis. We overrule Mother's two issues.

15

Having overruled Mother's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  May 9, 2012