NO. 07-10-0075-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

AUGUST 18, 2011

_____

IN THE INTEREST OF Q.W.J. AND S.C., CHILDREN

_____

FROM COUNTY COURT AT LAW NO. 2 OF RANDALL COUNTY;

NO. 6538-L2; HONORABLE RONNIE WALKER, JUDGE[1]

_____

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J.[2]

**MEMORANDUM OPINION**

Appellant, Adam, appeals the trial court's order terminating his parental rights to his child, S.C., and Appellant, Cassandra, appeals from the trial court's order terminating her parental rights to her children, Q.W.J. and S.C.[3]  Adam asserts reversible error in what he categorizes as the trial court's failure to make and file

---

[1]Hon. Abe Lopez, (Ret.) sitting by assignment.  Tex. Gov't Code Ann. § 75.002(a)(3) (West 2005).

[2]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.  Tex. Gov't Code Ann. § 75.002(a)(1) (West 2005).

[3]To protect the parents' and children's privacy, we refer to Appellants by their first names and other interested parties by their initials.  *See* Tex. Fam. Code Ann. § 109.002(d) (West 2008).  *See also* Tex. R. App. P. 9.8(b).

findings of fact and conclusions of law.  Cassandra challenges the trial court's order with a sole issue contending abuse of discretion by the trial court in its findings concerning the grounds necessary to support termination.  We affirm.

## Factual Background

The two children the subject of this proceeding are Q.W.J., a male born in January of 2002, and S.C., a female born in July of 2007.  R.C.H.[4] and Cassandra are Q.W.J.'s parents.  Adam and Cassandra are S.C.'s parents.  Adam is also the father of two other children, N.C. and J.C.[5]  In 2005, Adam ceased living with K.L., the biological mother of N.C. and J.C.  In 2006, Cassandra and her son, Q.W.J., moved in with Adam.  Cassandra became pregnant later that year and gave birth to S.C. in 2007.  In May 2008, all four children were residing with Adam's mother, D.V., who had been awarded custody of N.C. and J.C. in 2006 after the Texas Department of Family and Protective Services (the Department) had validated an allegation of neglectful supervision against Adam.[6]

In May 2008, a referral was made to the Department for suspected neglectful supervision and physical abuse by Cassandra against Adam's daughters, N.C. and J.C.  An investigator for Child Protective Services (CPS) was assigned to the case and she conducted interviews with the three older children and other family members.

---

[4]R.C.H. did not appear at trial and is not a party to this appeal.

[5]N.C. and J.C. are the children the subject of a companion case, No. 07-10-0087-CV, styled *In the Interest of N.C. and J.C.*, decided this same date.

[6]The record reflects that even though D.V. had custody of two of her grandchildren, she sometimes allowed them to live with Adam rather than deal with his anger.

According to N.C., Cassandra engaged in pushing her and J.C. and would lock them out on the porch during storms as a form of punishment. J.C. likewise reported that she and N.C. were pushed to the ground by Cassandra. Q.W.J. told the investigator that his mother would get angry with N.C. and J.C. and push and punch them. He also reported that his mother would shake S.C., an infant at the time, to get her to stop crying. N.C. claimed Cassandra would "wiggle" S.C. when she cried. The investigator testified that all the children had lice and all but N.C. had pink eye. She further testified the children were hungry, filthy and smelled.

During the interview process and sessions with couselors, the parents offered denials, excuses, and explained part of their conduct as discipline. After Adam and Cassandra left the CPS office, they received a call that S.C. had been taken to the hospital. Apparently, while still at the CPS office, S.C. had become unresponsive and her eyes crossed. She was taken to the hospital with seizure-type symptoms possibly resulting from being shaken; however, tests showed no injuries. The treating physician testified that although S.C. was not underweight or emaciated, she appeared neglected and was suffering from a vaginal yeast infection and had lice and pink eye.

After its investigation, the Department decided it was in the best interest of the children to remove them from their home and place them with relatives.[7] The Department initiated legal action for termination of parental rights on May 30, 2008. Over several years, a series of family service plans were implemented with a goal of

---

[7]Placement with relatives was never fully realized and the children were placed with foster families or in a residential treatment center.

reunification. However, on February 22, 2010,[8] after a trial before the bench, the trial court signed an order terminating Adam's parental rights to S.C. and Cassandra's parental rights to Q.W.J. and S.C.

## Procedural Background

Pursuant to section 263.405(d) of the Texas Family Code, on March 22, 2010, the trial court held a hearing to determine whether a new trial should be granted and whether the appeal was frivolous. Tex. Fam. Code Ann. § 263.405(d) (West 2008). After a brief hearing, the trial court signed an order denying Adam and Cassandra a new trial and dismissing their notices of appeal from the termination order as frivolous. They appealed the trial court's frivolous finding and denial of a free reporter's record. By opinion dated September 29, 2010, this Court found that arguable grounds for appeal existed, reversed the trial court's frivolous finding, and ordered that a free reporter's record be provided to the parties to pursue an appeal on the merits. *See In re Q.W.J.*, 331 S.W.3d 9, 14 (Tex.App.--Amarillo 2010, no pet.). After a reporter's record was provided, the parties filed their respective briefs challenging the termination order. This second appeal is on the merits of the termination order.

---

[8]During oral submission of this appeal, questions were raised on the duration of the underlying case on the docket in light of section 263.401(a) and (b) which provides for mandatory dismissal if trial on the merits is not timely commenced. Dismissal is appropriate if a party files a motion to dismiss pursuant to section 263.402(b). Tex. Fam. Code Ann. § 263.402(b) (West 2008). No motion was filed in the underlying proceeding. Thus, this Court is unable to grant relief because a party's failure to file a motion to dismiss waives the right to complain of the trial court's failure to dismiss. *See id.*

## Statement of Points

Section 263.405(b)(2) of the Family Code[9] currently provides that a statement of points on which a party intends to appeal be must filed not later than the fifteenth day after a final order is signed.[10]  Tex. Fam. Code Ann. § 263.405(b)(2) (West 2008). Presently, an appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points.  § 263.405(i).[11]

In his Statement of Points, Adam raises insufficiency of the evidence to support each of the four grounds found by the trial court for termination as well as the best interest finding.  He also alleges ineffective assistance of counsel and challenges the constitutionality of sections 109.002 and 263.405 of the Texas Family Code.  In her Statement of Points, Cassandra echoes the points raised by Adam.  On appeal, however, Adam only complains of the trial court's Findings of Fact and Conclusions of Law. Cassandra frames her sole contention as a challenge to the legal and factual sufficiency of the evidence to support the trial court's findings concerning the grounds for termination.  We will address each appellant's concerns separately.

---

[9]All future references to "§" or "section" are to the Texas Family Code Annotated unless otherwise designated.

[10]Effective September 1, 2011, termination cases involving the Department are governed by the procedures for accelerated appeals in civil cases under the Texas Rules of Appellate Procedure. Sections 263.405(b-1), (d), (e), (f), (h), and (i) have been repealed.  *See* Act of May 5, 2011, 82nd Leg., R.S., ch. 75, 2011 Tex. Sess. Law Serv. 348, 349.

[11]*But see In re B.G.*, 317 S.W.3d 250, 251-52 (Tex. 2010) (citing *In re J.O.A.*, 262 S.W.3d 7, 21-22 (Tex.App.--Amarillo 2008), *aff'd as modified and remanded*, 283 S.W.3d 336 (Tex. 2009)) (holding that statutory limitation does not preclude review of claims that may implicate due process concerns).

## Adam's Appeal

The trial court signed the termination order on February 26, 2010, and Adam timely filed his request for findings of fact and conclusions of law pursuant to Rule 296 of the Texas Rules of Civil Procedure on March 9, 2010. Although untimely,[12] the trial court signed a lengthy and detailed document entitled "Findings of Fact and Conclusions of Law" on April 1, 2010. Adam attacks the trial court's findings and conclusions as being nothing more than "evidentiary recitations" which are "of no value on appeal." He maintains the document is tantamount to no findings having been filed and concludes he has suffered harm as a result.[13] We disagree.

## Findings of Fact and Conclusions of Law

If properly requested, the trial court must prepare and file findings of fact and conclusions of law. Tex. R. Civ. P. 297. A trial court's failure to make and file findings is harmless if "the record before the appellate court affirmatively shows that the complaining party suffered no injury." *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (citing *Cherne Indus. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989)). The purpose for requesting written findings of fact and conclusions of law is to narrow the bases of the termination order to only a portion of the multiple claims and defenses in the case thereby reducing the number of contentions an appellant must raise on appeal. *Larry F. Smith*, *Inc. v. The Weber Co.*, *Inc.*, 110 S.W.3d 611, 614 (Tex.App.--Dallas 2003, pet.

---

[12]Findings of fact and conclusions of law must be filed within twenty days after a timely request. Tex. R. Civ. P. 297.

[13]We note that section 263.405(b) requires a Statement of Points to be filed within fifteen days of the termination order while a trial court is not required to file findings of fact and conclusions of law until twenty days after a timely request.

denied). Harm may exist when the circumstances of a case require an appellant to guess the reason for the trial court's ruling, making it difficult for an appellant to properly present his case on appeal. *See In re J.I.T.P.*, 99 S.W.3d 841, 848-49 (Tex.App.-- Houston [14th Dist.] 2003, no pet.). *See also* Tex. R. App. P. 44.1(a)(2).

## Discussion

Adam's challenge leaves us with two avenues for review. First, assuming *arguendo*, that the document entitled "Findings of Fact and Conclusions of Law" is tantamount to no findings being filed, as Adam urges, he failed to file a "Notice of Past Due Findings of Fact and Conclusions of Law" as required by Rule 297 of the Texas Rules of Civil Procedure. Second, if we accept the trial court's Findings of Fact and Conclusions of Law, Adam's dissatisfaction with the contents of those findings and conclusions could have been remedied by filing a request pursuant to Rule 298 for additional or amended findings and conclusions. Adam did not avail himself of either option. Thus, he has waived the opportunity to complain on appeal about the document entitled "Findings of Fact and Conclusions of Law." *See In re J.I.T.P.*, 99 S.W.3d at 848 (citing *Curtis v. Commission for Lawyer Discipline*, 20 S.W.3d 227, 232 (Tex.App.-- Houston [14th Dist. 2000, no pet.)).[14] Consequently, we overrule his sole issue.

---

[14]When, as Adam alleges, no findings are filed, the trial court's judgment implies all findings of fact necessary to support it. *Pharo v. Chambers County*, 922 S.W.2d 945, 948 (Tex. 1996). When a reporter's record is filed, implied findings are not conclusive and may be challenged for legal and factual sufficiency. *BMC Software Belgium*, *N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). However, Adam does not challenge the sufficiency of the evidence in his brief.

## Cassandra's Appeal

Cassandra maintains by a single issue[15] that the evidence is legally and factually insufficient to support the trial court's termination order with respect to Q.W.J. and S.C. and argues abuse of discretion by the trial court in making findings concerning the grounds necessary to terminate her parental rights. While we agree that the evidence is factually insufficient to support termination under section 161.001(1)(D) and legally insufficient to support termination under subparagraph (F) and (O), we disagree with Cassandra's evidentiary challenges to termination under section 161.001(1)(E).

## Standard of Review in Termination Cases

The natural right existing between parents and their children is of constitutional dimension. *See Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). *See also Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, termination proceedings are strictly scrutinized. *In Interest of G.M.*, 596 S.W.2d 846 (Tex. 1980). Parental rights, however, are not absolute, and it is essential that the emotional and physical interests of a child not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick*, 685 S.W.2d at 20. Thus, due process requires application of the clear and convincing standard of proof in cases

---

[15]Cassandra's Table of Contents in her brief lists a second issue beginning at page 11; however, the brief ends on page 11.

involving involuntary termination of parental rights. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *See* § 101.007. *See also In re C.H.,* 89 S.W.3d at 25-26.

The Family Code permits a court to order termination of parental rights if the petitioner establishes one or more acts or omissions enumerated under subsection (1) of the statute and also proves that termination of the parent-child relationship is in the best interest of the child. *See* § 161.001; *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Though the same evidence may be probative of both issues, both elements must be established and proof of one element does not relieve the petitioner of the burden of proving the other. *See In re C.H.*, 89 S.W.3d at 28; *Holley*, 544 S.W.2d at 370.

In a legal sufficiency review of the evidence to support an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established. § 101.007 (West 2008); *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.F.C.*, 96 S.W.3d at 266. Thus, we disregard all evidence

9

that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

The standard for reviewing the factual sufficiency of termination findings is whether the evidence is such that a reasonable factfinder could form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d at 25-26. Under that standard, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Only one statutory ground is required to terminate parental rights under section 161.001. *See In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.–San Antonio 2000, no pet.). Therefore, we will affirm the termination order if there is both legally and factually sufficient evidence on any statutory ground upon which the trial court relied in terminating parental rights as well as the best interest finding. *Id.*

**Discussion**

In addition to finding that termination of Cassandra's parental rights to Q.W.J. and S.C. was in their best interest, the trial court also found that Cassandra:

(1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children;

10

(2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children;

(3) failed to support the children in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition; and

(4) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (F), and (O) (West Supp. 2010).

## § 161.001(1)(D)

Under section 161.001(1)(D), parental rights may be terminated when clear and convincing evidence shows that a parent knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. We examine the time before the children's removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being. *Ybarra v. Tex. Dept of Human Services*, 869 S.W.2d 574, 577 (Tex.App.--Corpus Christi 1993, no writ). Although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering "environment." *See In re D.T.*, 34 S.W.3d 625, 633 (Tex.App.–Fort Worth 2000, pet. denied). *See also Matter of B.R.*, 822 S.W.2d 103, 105-06 (Tex.App.–Tyler 1991, writ denied) (citing *In Interest of L.S.*, 748 S.W.2d 571 (Tex.App.–Amarillo 1988, no writ)). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Texas Dept of*

*Pro. and Reg. Serv.*, 16 S.W.3d 390, 395 (Tex.App.--El Paso 2000, pet. denied). Additionally, subsection (D) permits termination based on a single act or omission by the parent. *In re L.C.*, 145 S.W.3d 790, 796 (Tex.App.–Texarkana 2004, no pet.).

**Discussion**

The record establishes that D.V. had custody of two of her granddaughters, N.C. and J.C., during the investigation and that Q.W.J. and S.C. also lived with her at the time. However, D.V. frequently allowed the children to live with Adam and Cassandra to avoid Adam's anger. The CPS investigator testified that in 2004 Cassandra was investigated for neglect and a dirty and filthy home with no electricity. The allegations, however, were ruled out. No testimony was presented about the children's living environment at the time of the hearing--whether it be D.V.'s home or Adam and Cassandra's home. There was also no evidence of surroundings that could endanger the children.

There is an abundance of evidence that all the children had lice and all but N.C. had pinkeye; but there is no evidence of how or where they contracted those conditions.[16] Scant evidence was presented that in 2006, while N.C. and J.C. were living with D.V., the Department removed Q.W.J. from Adam and Cassandra's home because of unsanitary living conditions. However, no details of those living conditions were provided.

---

[16]There is, however, evidence that Cassandra filled a prescription for S.C. for her pinkeye and she had appointments for the other infected children to see a doctor the day they were taken to the CPS office for interviews.

Parental conduct may produce an endangering environment. The event that initiated the underlying proceeding was that N.C and J.C. had told D.V. that Cassandra made them stand outside during thunderstorms as a form of punishment.[17] D.V. testified that she reported the abuse to the Department's toll free phone number which prompted the Department to arrange interviews with the family. During their interviews at The Bridge Children's Advocacy Center, N.C. and J.C. claimed that Cassandra would lock them out on the porch during storms. During his interview, Q.W.J. similarly claimed that his mother would force N.C. and J.C. outside during storms to punish them. However, Q.W.J. also claimed that everyone had been outside during a storm when they were barbecuing. In response to questioning, Q.W.J. responded that the girls were sent outside sometimes during the daytime, sometimes at nighttime, "sometimes it's raining . . . sometimes it's sunny." Petitioner's Exhibit One is a photograph of D.V.'s house which depicts a small, covered porch with a bench and chair. The record is unclear as to which home N.C. and J.C. were at when they were made to stand out on the porch during storms.

Viewing the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction as to the truth of the allegations sought to be established, we conclude there is legally sufficient evidence to show that Cassandra knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-

---

[17]While we recognize that Cassandra's conduct was directed at children which were not hers, it is not necessary that the questionable conduct be directed at the children the subject of the proceeding to determine whether termination of her parental rights is appropriate. *See Texas Dept of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). *See also In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex.App.-- Dallas 2006, pet. denied), *cert. denied*, 549 U.S. 1080, 127 S.Ct. 729, 166 L.Ed.2d 567 (2006) (noting that a parent's conduct toward a stepchild will suffice to support termination of another child).

being. However, in conducting a factual sufficiency review, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that Cassandra knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. We conclude that termination of Cassandra's parental rights to Q.W.J. and S.C. under section 161.001(1)(D) is not supported by factually sufficient evidence.

## § 161.001(1)(E)

Parental rights may be terminated under section 161.001(1)(E) if there is clear and convincing evidence that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the child. The cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395. Additionally, subsection (E) requires more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *In re D.T.*, 34 S.W.3d at 634. "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996), (citing *Texas Dept of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). *See also In re T.N.*, 180 S.W.3d 376, 383 (Tex.App.–Amarillo 2003, no pet.).

Parental knowledge that actual endangering conduct has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and

14

disregarded the risk. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist. 2005, no pet.). The child need not suffer injury and the parent's conduct need not be directed at the child. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex.App.--Fort Worth 2008, no pet.).

The law does not require that a child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to that child. *In re C.J.F.*, 134 S.W.3d 343, 352 (Tex.App.--Amarillo 2003, no pet.). "Rather, if the evidence shows a course of conduct which has the effect of endangering the emotional well-being of the child, a finding under section 161.001(1)(E) is supportable." *Id.*

### Discussion

To say that the evidence presented at trial was conflicting is an understatement. Several witnesses testified to claims of Cassandra pushing N.C. and J.C. and punching them to the ground.[18] There was also testimony that Q.W.J. and N.C. had witnessed Cassandra shake or "wiggle" her daughter, S.C., when she was an infant to stop her from crying. To the contrary, Cassandra testified that Q.W.J. and N.C. fabricated the infant shaking story, and she also denied abusing N.C. and J.C. and making them stand outside during storms. She testified that the children, including Q.W.J. were lying and she disagreed with the testimony presented by the Department's witnesses.

---

[18]Endangering conduct toward other children or family members is relevant under section 161.001(1)(E) to a determination of whether a parent engaged in conduct that endangered the children that are the subject of the suit. *See In Interest of D.L.N.*, 958 S.W.2d 934, 939 (Tex.App--Waco 1997, pet. denied)*, disapproved on other grounds*, *In re J.F.C.*, 96 S.W.3d at 267.

In 2006, the Department validated an allegation of neglectful supervision against Cassandra. She admitted to having her son, Q.W.J., removed from her care in 2006 due to unsanitary living conditions.

The record is replete with evidence, including admissions during Adam's testimony, that he assaulted not only Cassandra, but also K.L. (mother of N.C. and J.C.), and his mother, D.V. According to Adam, his assault against Cassandra, who was pregnant at the time with her third child, was in response to the Department informing him that S.C. had been taken to the hospital for a possible brain bleed caused by Cassandra shaking her. He justified his assault on Cassandra as protection of his children. Adam was arrested but Cassandra refused to press charges and the case was dismissed.

Adam's history with the Department dates back to 1999 when he was accused of abusing a niece and nephew. More accusations were made against him in 2001, but the cases were closed due to insufficient evidence. In 2006, however, the Department validated a claim against Adam for neglectful supervision of N.C. and J.C. He was involved with a woman who was on probation and he tested positive for methamphetamines. In 2007, the Department validated that Adam had abused Q.W.J. by slapping him in the face and leaving a handprint and also bruised his bottom. Q.W.J. reported to his counselor that Adam and Cassandra would spank him with a belt and leave bruises that were painful and required him to sit on a pillow.

Cassandra was aware that Adam had anger issues and that he had been involved with the Department for years. She knew that some of Adam's family

members, including his own mother, feared him. She also knew that he had an extensive criminal history dating back to when he was a juvenile and had tried to burn his house down.

D.V., who was the primary caretaker for the children when this case started, had been validated for physical abuse against another granddaughter in 2003. The granddaughter was taken to a hospital with a black eye and bruises on her buttocks.[19] D.V. testified that she used spanking as a form of punishment but did not use a belt; rather, she used a one inch by two inch board to spank her grandchildren.

Counselors for the Department testified that in addition to slaps and spankings which left bruises, Cassandra's children, as well as Adam's, suffer from various mental disorders. Q.W.J. was diagnosed with post traumatic stress disorder with a secondary diagnosis of attention deficit disorder, combined with hyperactivity, impulsivity and inattention. N.C. shows severe signs of sexual abuse and acts out in sexually inappropriate ways.[20] One incident involved her younger sister, J.C. N.C. speaks inappropriately and frightens other children. She is unable to be in a foster home and lives in a residential treatment center. J.C., described as more docile, was diagnosed with an adjustment disorder, depression and anxiety. S.C. suffers from reactive attachment disorder and anxiety. Her behavior is also indicative of sexual abuse and she is behind in verbal and motor skills. The counselors testified that any contact between the children and the family would be detrimental.

---

[19]It is noteworthy that the Department gave D.V. custody of N.C. and J.C. knowing that D.V. had been validated for abuse against another granddaughter.

[20]Notwithstanding that several of the children's behavior is consistent with sexual abuse, the Department was unable to validate any allegations of sexual abuse against Adam.

The State was required to prove that either Cassandra or other persons with whom she knowingly placed her children, engaged in endangering conduct. There is evidence that Cassandra shook S.C. when she was an infant and the treating physician at the emergency room testified that although S.C. was not underweight, she appeared neglected and not well cared for. The evidence demonstrates that both Adam and D.V., who interacted with all the children, engaged in conduct that resulted in physical injury to one or more of the children as well as emotional trauma. Adam slapped Q.W.J. and left a handprint on his face and also spanked him hard enough to leave bruises. D.V. had been validated for abuse on another granddaughter and admitted she used a board to spank the children.

Cassandra was aware of Adam's and D.V.'s history with the Department and allowed her children to live with them. Her behavior can be described as a conscious course of conduct that exposed her children to physical abuse and emotional trauma. Cassandra testified that if she was allowed to keep her children, D.V. would be their caretaker while she worked. Although Cassandra testified that if given a choice, she would choose her children over Adam, she had a history of separating from him then reconciling. During the hearing, she was still living with him. We conclude that termination of Cassandra's paternal rights under section 161.001(1)(E) is supported by legally and factually sufficient evidence and the trial court did not abuse its discretion in so finding.[21]

---

[21]Although we could affirm the termination order based on this finding alone, we will address the remaining grounds for fairness and certainty. *See In re A.B.*, 125 S.W.3d 769, 776 (Tex.App.--Texarkana 2003, pet. denied).

**§ 161.001(1)(F)**

Termination of Cassandra's parental rights was also based on her failure to support her children in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition.  However, during oral submission of this appeal, the State conceded there was evidence in the record of Cassandra supporting her children during the period described in section 161.001(1)(F). The Department filed its petition for termination on May 30, 2008, and Petitioner's Exhibit 19 shows that Cassandra made child support payments from October 7, 2008, through March 10, 2009 and consequently, the evidence is insufficient to support termination on that ground.

**§ 161.001(1)(O)**

One of the grounds for terminating Cassandra's parental rights was her failure to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the their removal under Chapter 262 for the abuse or neglect of the children.  The Supreme Court has noted that the "Legislature has specifically provided in subsection 161.001(1)(O) that failure to comply with *court orders like those issued in this case* is grounds for termination."  *See In re J.F.C.*, 96 S.W.3d at 284 (emphasis added).  *See also In re B.L.R.P.*, 269 S.W.3d 707, 711 (Tex.App.--Amarillo 2008, no pet.).

An order is defined as "a mandate; precept; command or direction authoritatively given; rule or regulation." *See In re B.L.R.P.*, 269 S.W.3d at 711. "A command, direction, or instruction. A written direction or command delivered by a court or judge." *See Black's Law Dictionary* 1206 (9th ed. 2009). The record establishes that on July 23, 2008, Cassandra signed only one of many of the Department's service plans. The record does not, however, contain any written orders requiring Cassandra to comply with any written court orders specifically establishing the actions necessary for Cassandra to obtain the return of her children. We conclude the Department failed to establish by legally sufficient evidence one of the essential elements under subparagraph (O) to support termination on that ground. We will not affirm a termination order on the basis of a violation of a court order that does not exist. *See In re B.L.R.P.*, 269 S.W.3d at 711 (declining to elevate the status of a family service plan to that of a court order).

## § 161.001(2) Best Interest

Notwithstanding the sufficiency of the evidence to support termination under section 161.001(1), we must also find clear and convincing evidence that termination of the parent-child relationship was in the best interest of Q.W.J. and S.C. *See* § 161.001(2). In deciding best interest, we consider numerous factors. *See* § 263.307(b). The Supreme Court has considered the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the

individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. These factors are not exhaustive; some listed factors may be inapplicable to some cases, while other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.* Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *See id.* at 28. In any case, there must be evidence from which a factfinder could reasonably have formed a firm conviction or belief that the child's best interest warranted termination. *In re D.S.A.*, 113 S.W.3d 567, 574 (Tex.App.--Amarillo 2003, no pet.).

**Discussion**

There is a strong presumption that a child's best interest is usually served by awarding custody to the natural parents. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). However, there is clear and convincing evidence that it is not in the best interest of Q.W.J. and S.C. to remain with Cassandra. Cassandra was evaluated by several counselors and a psychologist. She suffers from a persecutory idea that everyone is out to get her and does not believe she has done anything wrong. She maintains that the allegations by CPS are false and also minimizes Adam's abusive behavior.

21

The psychologist that evaluated Cassandra expressed concern with her involvement with Adam knowing his history with the Department and his other children. The psychologist's treatment revealed Cassandra's problems with interpersonal relationships and a narcissistic personality disorder. He testified that she has inadequate skills to provide for her children. Additionally, he saw no improvement on her part from 2007 to 2008.

One of the counselors conducted a bonding assessment between Cassandra and her children. Regarding S.C., Cassandra scored low in sensitivity, showed a lack of empathy and no ability to comfort S.C. Her scores were average on fostering social and emotional growth. The counselor recommended that S.C. would be at risk for neglect and abuse if returned to Cassandra. Concerning Q.W.J., Cassandra exhibited competitiveness during games without showing encouragement or positive feedback. Q.W.J. did not make eye contact with his mother and did not respond to her kiss on his forehead. The counselor opined that there was no bond between them and that it was unlikely a bond would develop. Another counselor testified that Cassandra was just going through the motions during her sessions. Reunification with her children would require daily therapy and Cassandra had failed to complete her family service plans in the past. She was not benefitting from counseling.

Cassandra also showed an unreliable work history. Although she did provide support for her children during 2008 and 2009, there were instances when she did not work and was not financially stable. She also lacked a reliable support network to help care for the children while she did work. She testified that if she was permitted to keep her children, while she was at work, they would be cared for by D.V., who had been

validated for abuse against a grandchild. Additionally, we have concluded that Cassandra knowingly allowed her children to remain with persons who engage in endangering conduct.

The children's caseworker testified that Q.W.J. and S.C. were living together in a therapeutic foster home and were thriving and that the goal was to have them adopted together. Their counselor testified she had seen improvement in their social skills while they were in foster care and S.C. had improved her verbal and motor skills. In January 2010, Q.W.J. seemed excited and positive and reported he had a great Christmas with his foster family. Q.W.J. told his counselor he did not want to see his parents. Applying section 263.307(a) and (b) of the Family Code and the *Holley* factors, we conclude there is legally and factually sufficient evidence to support the trial court's finding that termination of Cassandra's parental rights to Q.W.J. and S.C. is in their best interest.

## Conclusion

The trial court's order terminating the parental rights of Adam to S.C. and the parental rights of Cassandra to Q.W.J. and S.C. is supported by clear and convincing evidence. Consequently, the trial court's order is affirmed.

Patrick A. Pirtle
Justice

23