NO. 07-10-0075-CV

 

IN THE COURT OF APPEALS

 

FOR THE SEVENTH DISTRICT OF TEXAS

 

AT AMARILLO

 

PANEL E

 

AUGUST 18, 2011

 

______________________________

 

 

IN THE INTEREST OF Q.W.J. AND S.C., CHILDREN

 

_________________________________

 

FROM COUNTY COURT AT LAW NO. 2 OF RANDALL COUNTY;

 

NO. 6538-L2; HONORABLE RONNIE WALKER, JUDGE[1]

 

_______________________________

 

Before CAMPBELL and PIRTLE, JJ., and BOYD, S.J.[2]

MEMORANDUM OPINION

            Appellant,
Adam, appeals the trial court's order terminating his parental rights to his
child, S.C., and Appellant, Cassandra, appeals from the trial court's order
terminating her parental rights to her children, Q.W.J. and S.C.[3]
 Adam asserts reversible error in what he
categorizes as the trial court's failure to make and file findings of fact and
conclusions of law.  Cassandra challenges
the trial court's order with a sole issue contending abuse of discretion by the
trial court in its findings concerning the grounds necessary to support
termination.  We affirm.

Factual Background

            The
two children the subject of this proceeding are Q.W.J., a male born in January of 2002, and S.C., a
female born in July of 2007.  R.C.H.[4]
and Cassandra are Q.W.J.'s parents.  Adam
and Cassandra are S.C.'s parents.  Adam
is also the father of two other children, N.C. and J.C.[5]
 In 2005, Adam ceased living with K.L., the
biological mother of N.C. and J.C.  In
2006, Cassandra and her son, Q.W.J., moved in with Adam.  Cassandra became pregnant later that year and
gave birth to S.C. in 2007.  In May 2008,
all four children were residing with Adam's mother, D.V., who had been awarded custody
of N.C. and J.C. in 2006 after the Texas Department of Family and Protective
Services (the Department) had validated an allegation of neglectful supervision
against Adam.[6]  

In May 2008, a referral was made to
the Department for suspected neglectful supervision and physical abuse by Cassandra
against Adam's daughters, N.C. and J.C. 
An investigator for Child Protective Services (CPS) was assigned to the
case and she conducted interviews with the three older children and other
family members.  

            According
to N.C., Cassandra engaged in pushing her and J.C. and would lock them out on
the porch during storms as a form of punishment.  J.C. likewise reported that she and N.C. were
pushed to the ground by Cassandra.  Q.W.J.
told the investigator that his mother would get angry with N.C. and J.C. and
push and punch them.  He also reported
that his mother would shake S.C., an infant at the time, to get her to stop crying.  N.C. claimed Cassandra would
"wiggle" S.C. when she cried.  The
investigator testified that all the children had lice and all but N.C. had pink
eye.  She further testified the children
were hungry, filthy and smelled.  

            During
the interview process and sessions with couselors, the parents offered denials,
excuses, and explained part of their conduct as discipline.  After Adam and Cassandra left the CPS office,
they received a call that S.C. had been taken to the hospital.  Apparently, while still at the CPS office,
S.C. had become unresponsive and her eyes crossed.  She was taken to the hospital with
seizure-type symptoms possibly resulting from being shaken; however, tests
showed no injuries.  The treating physician
testified that although S.C. was not underweight or emaciated, she appeared
neglected and was suffering from a vaginal yeast infection and had lice and
pink eye.  

After its investigation, the Department
decided it was in the best interest of the children to remove them from their
home and place them with relatives.[7]  The Department initiated legal action for
termination of parental rights on May 30, 2008. 
Over several years, a series of family service plans were implemented
with a goal of reunification.  However, on
February 22, 2010,[8]
after a trial before the bench, the trial court signed an order terminating
Adam's parental rights to S.C. and Cassandra's parental rights to Q.W.J. and
S.C.  

Procedural Background

            Pursuant
to section 263.405(d) of the Texas Family Code, on March 22, 2010, the trial
court held a hearing to determine whether a new trial should be granted and
whether the appeal was frivolous.  Tex. Fam. Code Ann. § 263.405(d) (West 2008).  After a brief hearing, the trial court signed
an order denying Adam and Cassandra a new trial and dismissing their notices of
appeal from the termination order as frivolous. 
They appealed the trial court's frivolous finding and denial of a free
reporter's record.  By opinion dated
September 29, 2010, this Court found that arguable grounds for appeal existed,
reversed the trial court's frivolous finding, and ordered that a free
reporter's record be provided to the parties to pursue an appeal on the
merits.  See In re Q.W.J., 331 S.W.3d 9, 14
(Tex.App.--Amarillo 2010, no pet.). 
After a reporter's record was provided, the parties filed their
respective briefs challenging the termination order.  This second appeal is on the merits of the
termination order.




 

Statement of Points

            Section
263.405(b)(2) of the Family Code[9]
currently provides that a statement of points on which a party intends to
appeal be must filed not later than the fifteenth day after a final order is
signed.[10]  Tex. Fam. Code Ann. § 263.405(b)(2) (West 2008).  Presently,
an appellate court may not consider any issue that was not specifically
presented to the trial court in a timely filed statement of points.  § 263.405(i).[11]  

In his Statement of Points, Adam
raises insufficiency of the evidence to support each of the four grounds found
by the trial court for termination as well as the best interest finding.  He also alleges ineffective assistance of
counsel and challenges the constitutionality of sections 109.002 and 263.405 of
the Texas Family Code.  In her Statement
of Points, Cassandra echoes the points raised by Adam.  On appeal, however, Adam only complains of
the trial court's Findings of Fact and Conclusions of Law. Cassandra frames her
sole contention as a challenge to the legal and factual sufficiency of the
evidence to support the trial court's findings concerning the grounds for
termination.  We will address each
appellant's concerns separately.




 

Adam's Appeal

The trial court signed the
termination order on February 26, 2010, and Adam timely filed his request for
findings of fact and conclusions of law pursuant to Rule 296 of the Texas Rules
of Civil Procedure on March 9, 2010. 
Although untimely,[12]
the trial court signed a lengthy and detailed document entitled "Findings
of Fact and Conclusions of Law" on April 1, 2010.  Adam attacks the trial court's findings and
conclusions as being nothing more than "evidentiary recitations"
which are "of no value on appeal." 
He maintains the document is tantamount to no findings having been filed
and concludes he has suffered harm as a result.[13]  We disagree.

Findings of Fact and Conclusions of Law

            If
properly requested, the trial court must prepare and file findings of fact and
conclusions of law.  Tex. R. Civ. P.
297.  A trial court's failure to make and
file findings is harmless if "the record before the appellate court
affirmatively shows that the complaining party suffered no injury."  Tenery v. Tenery, 932 S.W.2d 29, 30 (Tex. 1996) (citing Cherne Indus. v. Magallanes,
763 S.W.2d 768, 772 (Tex. 1989)).  The
purpose for requesting written findings of fact and conclusions of law is to
narrow the bases of the termination order to only a portion of the multiple
claims and defenses in the case thereby reducing the number of contentions an
appellant must raise on appeal.  Larry F. Smith, Inc. v. The Weber Co.,
Inc., 110 S.W.3d 611, 614 (Tex.App.--Dallas
2003, pet. denied). 
Harm may exist when the circumstances of a case require an appellant to
guess the reason for the trial court's ruling, making it difficult for an
appellant to properly present his case on appeal.  See
In re J.I.T.P., 99 S.W.3d 841, 848-49
(Tex.App.--Houston [14th Dist.] 2003, no pet.). 
See also Tex. R. App. P.
44.1(a)(2).

Discussion

            Adam's
challenge leaves us with two avenues for review.  First, assuming arguendo, that the document entitled "Findings of Fact and
Conclusions of Law" is tantamount to no findings being filed, as Adam
urges, he failed to file a "Notice of Past Due Findings of Fact and
Conclusions of Law" as required by Rule 297 of the Texas Rules of Civil
Procedure.  Second, if we accept the
trial court's Findings of Fact and Conclusions of Law, Adam's dissatisfaction
with the contents of those findings and conclusions could have been remedied by
filing a request pursuant to Rule 298 for additional or amended findings and
conclusions.  Adam did not avail himself
of either option.  Thus, he has waived
the opportunity to complain on appeal about the document entitled
"Findings of Fact and Conclusions of Law."  See In re
J.I.T.P., 99 S.W.3d at 848 (citing Curtis
v. Commission for Lawyer Discipline, 20 S.W.3d 227, 232 (Tex.App.--Houston
[14th Dist. 2000, no pet.)).[14]  Consequently, we overrule his sole issue.




 

Cassandra's Appeal

            Cassandra maintains by a
single issue[15] that
the evidence is legally and factually insufficient to support the trial court's
termination order with respect to Q.W.J. and S.C. and argues abuse of
discretion by the trial court in making findings concerning the grounds
necessary to terminate her parental rights. 
While we agree that the evidence is factually insufficient to support
termination under section 161.001(1)(D) and legally insufficient
to support termination under subparagraph (F) and (O), we disagree with Cassandra's
evidentiary challenges to termination under section 161.001(1)(E).

Standard of Review in Termination Cases

            The
natural right existing between parents and their children is of constitutional
dimension.  See Santosky v. Kramer, 455 U.S. 745,
758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).  See also Holick v. Smith, 685 S.W.2d 18,
20 (Tex. 1985).  Consequently,
termination proceedings are strictly scrutinized.  In Interest of G.M., 596 S.W.2d 846 (Tex. 1980).  Parental rights, however, are not absolute,
and it is essential that the emotional and physical interests of a child not be
sacrificed merely to preserve those rights. 
In re C.H.,
89 S.W.3d 17, 26 (Tex. 2002).

A termination decree is complete,
final, irrevocable, and divests for all time that natural right as well as all
legal rights, privileges, duties, and powers with respect to each other except
for the child=s right to
inherit.  Holick,
685 S.W.2d at 20. 
Thus, due process requires application of the clear and convincing
standard of proof in cases involving involuntary termination of parental
rights.  In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  Clear and convincing evidence is that measure
or degree of proof which will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  See '
101.007.  See also In re C.H., 89 S.W.3d at 25-26.  

The Family Code permits a court to
order termination of parental rights if the petitioner establishes one or more
acts or omissions enumerated under subsection (1) of the statute and also
proves that termination of the parent-child relationship is in the best interest
of the child.  See ' 161.001; Holley
v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). 
Though the same evidence may be probative of both issues, both elements
must be established and proof of one element does not relieve the petitioner of
the burden of proving the other.  See In
re C.H., 89 S.W.3d at 28; Holley, 544
S.W.2d at 370. 

In a legal sufficiency review of the evidence to support an
order terminating parental rights, we look at all the evidence in the light
most favorable to the finding to determine whether a reasonable trier of fact
could have formed a firm belief or conviction as to the truth of the
allegations sought to be established.  ' 101.007 (West 2008); In re J.F.C.,
96 S.W.3d at 266.  To give appropriate
deference to the factfinder's conclusions and the role of a court conducting a
legal sufficiency review, looking at the evidence in the light most favorable
to the judgment means that a reviewing court must assume the factfinder
resolved disputed facts in favor of its finding if a reasonable factfinder
could do so.  In re J.F.C., 96 S.W.3d at 266.  Thus, we disregard all evidence that a
reasonable factfinder could have disbelieved or found to have been
incredible.  Id. 

The standard for reviewing the factual sufficiency of
termination findings is whether the evidence is such that a reasonable
factfinder could form a firm belief or conviction about the truth of the
Department's allegations.  In re C.H., 89 S.W.3d at 25-26.  Under that standard, we consider whether the
disputed evidence is such that a reasonable factfinder could not have resolved
the disputed evidence in favor of its finding. 
In re J.F.C., 96 S.W.3d at 266.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction, then the evidence is factually
insufficient.  Id.  

Only one statutory ground is required to terminate parental
rights under section 161.001.  See
In re S.F., 32 S.W.3d 318, 320 (Tex.App.BSan Antonio 2000,
no pet.).  Therefore, we will affirm the termination
order if there is both legally and factually
sufficient evidence on any statutory ground upon which the trial court relied
in terminating parental rights as well as the best interest finding.  Id. 

Discussion

            In addition to finding that
termination of Cassandra's parental rights to Q.W.J. and S.C. was in their best
interest, the trial court also found that Cassandra:

(1) knowingly placed or knowingly
allowed the children to remain in conditions or surroundings which endangered
the physical or emotional well-being of the children;

(2) engaged in conduct or
knowingly placed the children with persons who engaged in conduct which
endangered the physical or emotional well-being of the children;

(3) failed to support the children in accordance with
her ability during a period of one year ending within six months of the date of
the filing of the petition; and

(4) failed to comply with the provisions of a court
order that specifically established the actions necessary for her to obtain the
return of the children who have been in the permanent or temporary managing
conservatorship of the Department of Family and Protective Services for not
less than nine months as a result of the children's removal from the parent
under Chapter 262 for the abuse or neglect of the children.

See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (F), and (O) (West Supp. 2010).

§ 161.001(1)(D) 

Under section 161.001(1)(D),
parental rights may be terminated when clear and convincing evidence shows that
a parent knowingly placed or knowingly allowed her child to remain in
conditions or surroundings that endanger the physical or emotional well-being
of the child.  We examine the time before
the children's removal to determine whether the environment itself posed a
danger to the child's physical or emotional well-being.  Ybarra v. Tex. Dept of Human Services, 869 S.W.2d 574, 577
(Tex.App.--Corpus Christi 1993, no writ).  Although the focus of subsection (D) is on
the child=s living environment and not on the
parent=s conduct, parental conduct may
produce an endangering Aenvironment.@  See In re D.T., 34
S.W.3d 625, 633 (Tex.App.BFort Worth 2000, pet. denied).  See also Matter of B.R.,
822 S.W.2d 103, 105-06 (Tex.App.BTyler 1991, writ denied) (citing In Interest of L.S.,
748 S.W.2d 571 (Tex.App.BAmarillo 1988, no
writ)).  Subsection (D) requires a showing that the
environment in which the child is placed endangered the child=s physical or emotional health.  Doyle v. Texas Dept of Pro.
and Reg. Serv., 16 S.W.3d 390, 395 (Tex.App.--El
Paso 2000, pet. denied).  Additionally,
subsection (D) permits termination based on a single act or omission by the
parent.  In re L.C.,
145 S.W.3d 790, 796 (Tex.App.BTexarkana 2004, no pet.). 


Discussion

            The record establishes that D.V. had
custody of two of her granddaughters, N.C. and J.C., during the investigation
and that Q.W.J. and S.C. also lived with her at the time.  However, D.V. frequently allowed the children
to live with Adam and Cassandra to avoid Adam's anger.  The CPS investigator testified that in 2004 Cassandra
was investigated for neglect and a dirty and filthy home with no
electricity.  The allegations, however,
were ruled out.  No testimony was presented
about the children's living environment at the time of the hearing--whether it be D.V.'s home or Adam and Cassandra's home.  There was also no evidence of surroundings
that could endanger the children.  

There is an abundance of evidence that all the children had
lice and all but N.C. had pinkeye; but there is no evidence of how or where they
contracted those conditions.[16]  Scant evidence was presented that in 2006,
while N.C. and J.C. were living with D.V., the Department removed Q.W.J. from
Adam and Cassandra's home because of unsanitary living conditions.  However, no details of those living
conditions were provided.  

            Parental conduct may
produce an endangering environment.  The
event that initiated the underlying proceeding was that N.C and J.C. had told
D.V. that Cassandra made them stand outside during thunderstorms as a form of
punishment.[17]  D.V. testified that she reported the abuse to
the Department's toll free phone number which prompted the Department to
arrange interviews with the family.  During their interviews at The Bridge
Children's Advocacy Center, N.C. and J.C. claimed that Cassandra would lock
them out on the porch during storms. 
During his interview, Q.W.J. similarly claimed that his mother would
force N.C. and J.C. outside during storms to punish them.  However, Q.W.J. also claimed that everyone
had been outside during a storm when they were barbecuing.  In response to questioning, Q.W.J. responded
that the girls were sent outside sometimes during the daytime, sometimes at
nighttime, "sometimes it's raining . . . sometimes it's sunny."  Petitioner's Exhibit One is a photograph of
D.V.'s house which depicts a small, covered porch with a bench and chair.  The record is unclear as to which home N.C.
and J.C. were at when they were made to stand out on the porch during
storms.  

Viewing the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction as to the truth of the allegations sought to be established,
we conclude there is legally sufficient evidence to show that Cassandra
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings that endangered their physical or emotional well-being.  However, in conducting a factual sufficiency
review, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction that Cassandra knowingly
allowed the children to remain in conditions or surroundings that endangered their
physical or emotional well-being.  We
conclude that termination of Cassandra's parental rights to Q.W.J. and S.C. under
section 161.001(1)(D) is not supported by factually
sufficient evidence.

§ 161.001(1)(E)

Parental rights may be terminated under section 161.001(1)(E)
if there is clear and convincing evidence that the parent engaged in conduct or
knowingly placed the child with persons who engaged in conduct which endangers
the child.   The cause of the danger to the child must be
the parent's conduct alone, as evidenced not only by the parent's actions but
also by the parent's omission or failure to act.  Doyle, 16 S.W.3d at 395.
 Additionally, subsection (E) requires more
than a single act or omission; a voluntary, deliberate, and conscious Acourse of conduct@ by the parent is required.  In re D.T., 34 S.W.3d at 634.  AEndanger@ means more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family environment.  In re M.C., 917 S.W.2d 268, 269 (Tex.
1996), (citing Texas Dept of Human Services v. Boyd, 727 S.W.2d
531, 533 (Tex. 1987)).  See also In re T.N., 180 S.W.3d 376, 383 (Tex.App.BAmarillo 2003, no
pet.).  

Parental knowledge that actual endangering conduct has
occurred is not necessary; it is sufficient that the parent was aware of the
potential for danger and disregarded the risk. 
In re S.M.L.,
171 S.W.3d 472, 477 (Tex.App.--Houston [14th Dist. 2005, no pet.).  The child need not suffer injury and the
parent's conduct need not be directed at the child.  In re M.C.T., 250 S.W.3d 161, 169 (Tex.App.--Fort Worth 2008, no
pet.).

The law does not require that a child be a victim of abusive
conduct before the Department can involuntarily terminate a parent's rights to
that child.  In re C.J.F., 134 S.W.3d 343, 352
(Tex.App.--Amarillo 2003, no pet.). 
"Rather, if the evidence shows a course of conduct which has the
effect of endangering the emotional well-being of the child, a finding under
section 161.001(1)(E) is supportable."  Id.

Discussion

To say that the evidence presented at trial was conflicting
is an understatement.  Several witnesses
testified to claims of Cassandra pushing N.C. and J.C. and punching them to the
ground.[18]  There was also testimony that Q.W.J. and N.C.
had witnessed Cassandra shake or "wiggle" her daughter, S.C., when
she was an infant to stop her from crying. 
To the contrary, Cassandra testified that Q.W.J. and N.C. fabricated the
infant shaking story, and she also denied abusing N.C. and J.C. and making them
stand outside during storms.  She
testified that the children, including Q.W.J. were lying and she disagreed with
the testimony presented by the Department's witnesses.

In 2006, the Department validated an allegation of neglectful
supervision against Cassandra.  She admitted
to having her son, Q.W.J., removed from her care in 2006 due to unsanitary
living conditions.  

The record is replete with evidence, including admissions
during Adam's testimony, that he assaulted not only Cassandra, but also K.L.
(mother of N.C. and J.C.), and his mother, D.V. 
According to Adam, his assault against Cassandra, who was pregnant at
the time with her third child, was in response to the Department informing him
that S.C. had been taken to the hospital for a possible brain bleed caused by Cassandra
shaking her.  He justified his assault on
Cassandra as protection of his children.  Adam was arrested but Cassandra refused to
press charges and the case was dismissed. 


Adam's history with the Department dates back to 1999 when he
was accused of abusing a niece and nephew. 
More accusations were made against him in 2001, but the cases were
closed due to insufficient evidence.  In
2006, however, the Department validated a claim against Adam for neglectful
supervision of N.C. and J.C.  He was
involved with a woman who was on probation and he tested positive for
methamphetamines.  In 2007, the
Department validated that Adam had abused Q.W.J. by slapping him in the face
and leaving a handprint and also bruised his bottom.  Q.W.J. reported to his counselor that Adam
and Cassandra would spank him with a belt and leave bruises that were painful
and required him to sit on a pillow.

Cassandra was aware that Adam had anger issues and that he had
been involved with the Department for years. 
She knew that some of Adam's family members, including his own mother,
feared him.  She also knew that he had an
extensive criminal history dating back to when he was a juvenile and had tried
to burn his house down.

D.V., who was the primary caretaker for the children when
this case started, had been validated for physical abuse against another
granddaughter in 2003.  The granddaughter
was taken to a hospital with a black eye and bruises on her buttocks.[19]  D.V. testified that she used spanking as a
form of punishment but did not use a belt; rather, she used a one inch by two
inch board to spank her grandchildren.  

Counselors for the Department testified that in addition to slaps
and spankings which left bruises, Cassandra's children, as well as Adam's,
suffer from various mental disorders. 
Q.W.J. was diagnosed with post traumatic stress disorder with a
secondary diagnosis of attention deficit disorder, combined with hyperactivity,
impulsivity and inattention.  N.C. shows
severe signs of sexual abuse and acts out in sexually inappropriate ways.[20]  One incident involved her younger sister,
J.C.  N.C. speaks inappropriately and
frightens other children.  She is unable
to be in a foster home and lives in a residential treatment center.  J.C., described as more docile, was diagnosed
with an adjustment disorder, depression and anxiety.  S.C. suffers from reactive attachment disorder
and anxiety.  Her behavior is also
indicative of sexual abuse and she is behind in verbal and motor skills.  The counselors testified that any contact between
the children and the family would be detrimental.  

The State was required to prove that either Cassandra or
other persons with whom she knowingly placed her children, engaged in
endangering conduct.  There is evidence
that Cassandra shook S.C. when she was an infant and the treating physician at
the emergency room testified that although S.C. was not underweight, she
appeared neglected and not well cared for. 
The evidence demonstrates that both Adam and D.V., who interacted with
all the children, engaged in conduct that resulted in physical injury to one or
more of the children as well as emotional trauma.  Adam slapped Q.W.J. and left a handprint on
his face and also spanked him hard enough to leave bruises.  D.V. had been validated for abuse on another
granddaughter and admitted she used a board to spank the children.

Cassandra was aware of Adam's and D.V.'s history with the
Department and allowed her children to live with them.  Her behavior can be described as a conscious
course of conduct that exposed her children to physical abuse and emotional
trauma. Cassandra testified that if she was allowed to keep her children, D.V.
would be their caretaker while she worked. 
Although Cassandra testified that if given a choice, she would choose
her children over Adam, she had a history of separating from him then
reconciling.  During the hearing, she was
still living with him.  We conclude that
termination of Cassandra's paternal rights under section 161.001(1)(E) is supported by legally and factually sufficient
evidence and the trial court did not abuse its discretion in so finding.[21]




 

§ 161.001(1)(F)

            Termination of Cassandra's parental
rights was also based on her failure to support her children in accordance with
her ability during a period of one year ending within six months of the date of
the filing of the petition.  However, during
oral submission of this appeal, the State conceded there was evidence in the
record of Cassandra supporting her children during the period described in
section 161.001(1)(F).  The Department
filed its petition for termination on May 30, 2008, and Petitioner's Exhibit 19
shows that Cassandra made child support payments from October 7, 2008, through
March 10, 2009 and consequently, the evidence is insufficient to support termination
on that ground.

§ 161.001(1)(O)

One of the grounds for terminating Cassandra's
parental rights was her failure to comply with the provisions of a court order
that specifically established the actions necessary for her to obtain the
return of her children who had been in the permanent or temporary managing
conservatorship of the Department for not less than nine months as a result of
the their removal under Chapter 262 for the abuse or neglect of the children.  The Supreme Court has noted that the
"Legislature has specifically provided in subsection 161.001(1)(O) that
failure to comply with court orders like
those issued in this case is grounds for termination."  See In
re J.F.C., 96 S.W.3d at 284 (emphasis added).  See also In re B.L.R.P., 269 S.W.3d 707, 711 (Tex.App.--Amarillo
2008, no pet.).  




 

Discussion

An order is defined as "a
mandate; precept; command or direction authoritatively given; rule or
regulation."  See In re B.L.R.P., 269 S.W.3d at 711.  "A command, direction,
or instruction.  A written
direction or command delivered by a court or judge."  See
Black's Law Dictionary 1206 (9th ed. 2009). 
The record establishes that on July 23, 2008, Cassandra signed only one
of many of the Department's service plans. 
The record does not, however, contain any written orders requiring Cassandra
to comply with any written court orders specifically establishing the actions
necessary for Cassandra to obtain the return of her children.  We conclude the Department failed to
establish by legally sufficient evidence one of the essential elements under
subparagraph (O) to support termination on that ground.  We will not affirm a termination order on the
basis of a violation of a court order that does not exist.  See In
re B.L.R.P., 269 S.W.3d at 711 (declining to elevate the status of a family
service plan to that of a court order).  

§ 161.001(2) Best
Interest 

Notwithstanding the sufficiency of the evidence to support
termination under section 161.001(1), we must also find clear and convincing
evidence that termination of the parent-child relationship was in the best
interest of Q.W.J. and S.C.  See ' 161.001(2).  In deciding best interest, we consider numerous
factors.  See § 263.307(b).  The
Supreme Court has considered the following factors: (1) the desires of the
child; (2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future; (4)
the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals; (6) the plans for the child by these
individuals; (7) the stability of the home; (8) the acts or omissions of the
parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley, 544 S.W.2d at 371‑72. 
These factors are not exhaustive; some listed factors may be
inapplicable to some cases, while other factors not on the list may also be
considered when appropriate.  In re C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence of one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each Holley
factor will not support such a finding.  Id.  Evidence that proves one or more statutory
grounds for termination may also constitute evidence illustrating that
termination is in the child's best interest. 
See id. at 28.  In any case, there must be evidence from
which a factfinder could reasonably have formed a firm conviction or belief
that the child's best interest warranted termination.  In re D.S.A., 113
S.W.3d 567, 574 (Tex.App.-‑Amarillo 2003, no pet.). 

Discussion

There is a strong presumption that a child=s best interest is
usually served by awarding custody to the natural parents.  In re V.L.K., 24
S.W.3d 338, 341 (Tex. 2000). 
However, there is clear and convincing evidence that it is not in the
best interest of Q.W.J. and S.C. to remain with Cassandra. Cassandra was
evaluated by several counselors and a psychologist.  She suffers from a persecutory idea that
everyone is out to get her and does not believe she has done anything wrong.  She maintains that the allegations by CPS are
false and also minimizes Adam's abusive behavior.  

The psychologist that evaluated Cassandra
expressed concern with her involvement with Adam knowing his history with the
Department and his other children.  The
psychologist's treatment revealed Cassandra's problems with interpersonal
relationships and a narcissistic personality disorder.  He testified that she has inadequate skills
to provide for her children. 
Additionally, he saw no improvement on her part from 2007 to 2008.

One of the counselors conducted a bonding
assessment between Cassandra and her children. 
Regarding S.C., Cassandra scored low in sensitivity, showed a lack of
empathy and no ability to comfort S.C. 
Her scores were average on fostering social and emotional growth. The
counselor recommended that S.C. would be at risk for neglect and abuse if
returned to Cassandra.  Concerning Q.W.J.,
Cassandra exhibited competitiveness during games without showing encouragement
or positive feedback.  Q.W.J. did not
make eye contact with his mother and did not respond to her kiss on his
forehead.  The counselor opined that
there was no bond between them and that it was unlikely a bond would develop.  Another counselor testified that Cassandra
was just going through the motions during her sessions.  Reunification with her children would require
daily therapy and Cassandra had failed to complete her family service plans in
the past.  She was not benefitting from
counseling.  

Cassandra also showed an unreliable work
history.  Although she did provide
support for her children during 2008 and 2009, there were instances when she
did not work and was not financially stable. 
She also lacked a reliable support network to help care for the children
while she did work.  She testified that
if she was permitted to keep her children, while she was at work, they would be
cared for by D.V., who had been validated for abuse against a grandchild.  Additionally, we have concluded that Cassandra
knowingly allowed her children to remain with persons who engage in endangering
conduct.

The children's caseworker testified that
Q.W.J. and S.C. were living together in a therapeutic foster home and were thriving
and that the goal was to have them adopted together.  Their counselor testified she had seen
improvement in their social skills while they were in foster care and S.C. had
improved her verbal and motor skills.  In
January 2010, Q.W.J. seemed excited and positive and reported he had a great
Christmas with his foster family.  Q.W.J.
told his counselor he did not want to see his parents.  Applying section 263.307(a) and (b) of the
Family Code and the Holley factors,
we conclude there is legally and factually sufficient evidence to support the
trial court's finding that termination of Cassandra's parental rights to Q.W.J.
and S.C. is in their best interest.

Conclusion

            The trial court's order terminating
the parental rights of Adam to S.C. and the parental rights of Cassandra to
Q.W.J. and S.C. is supported by clear and convincing evidence.  Consequently, the trial court's order is
affirmed.

 

                                                                                    Patrick A. Pirtle

                                                                                          Justice











[1]Hon. Abe
Lopez, (Ret.) sitting by assignment. 
Tex. Gov't Code Ann. § 75.002(a)(3) (West
2005).

 





[2]John
T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.  Tex. Gov’t Code
Ann. § 75.002(a)(1) (West 2005).

 





[3]To
protect the parents' and children's privacy, we refer to Appellants by their
first names and other interested parties by their initials.  See Tex.
Fam. Code Ann. § 109.002(d) (West 2008).  
See also Tex. R. App. P.
9.8(b).





[4]R.C.H.
did not appear at trial and is not a party to this appeal.

 





[5]N.C.
and J.C. are the children the subject of a companion
case, No. 07-10-0087-CV, styled In the
Interest of N.C. and J.C., decided this same date. 

 





[6]The
record reflects that even though D.V. had custody of two of her grandchildren,
she sometimes allowed them to live with Adam rather than deal with his anger. 





[7]Placement
with relatives was never fully realized and the children were placed with
foster families or in a residential treatment center.

 





[8]During
oral submission of this appeal, questions were raised on the duration of the
underlying case on the docket in light of section 263.401(a) and (b) which
provides for mandatory dismissal if trial on the merits is not timely
commenced.  Dismissal is appropriate if a
party files a motion to dismiss pursuant to section 263.402(b).  Tex. Fam. Code Ann. § 263.402(b) (West 2008).  No motion was filed in the underlying
proceeding.  Thus, this Court is unable
to grant relief because a party's failure to file a motion to dismiss waives
the right to complain of the trial court's failure to dismiss.  See id.

 





[9]All
future references to "§" or "section" are to the Texas
Family Code Annotated unless otherwise designated.

 





[10]Effective
September 1, 2011, termination cases involving the Department are governed by
the procedures for accelerated appeals in civil cases under the Texas Rules of
Appellate Procedure.  Sections
263.405(b-1), (d), (e), (f), (h), and (i) have been
repealed.  See Act of May 5, 2011, 82nd Leg., R.S., ch.
75, 2011 Tex. Sess. Law Serv. 348, 349. 

 





[11]But see In re B.G., 317 S.W.3d 250,
251-52 (Tex. 2010) (citing In re J.O.A.,
262 S.W.3d 7, 21-22 (Tex.App.--Amarillo 2008), aff'd as modified and remanded, 283 S.W.3d 336 (Tex. 2009))
(holding that statutory limitation does not preclude review of claims that may
implicate due process concerns).

 





[12]Findings
of fact and conclusions of law must be filed within twenty days after a timely
request.  Tex. R. Civ. P. 297.

 





[13]We
note that section 263.405(b) requires a Statement of Points to be filed within
fifteen days of the termination order while a trial court is not required to
file findings of fact and conclusions of law until twenty days after a timely
request.





[14]When,
as Adam alleges, no findings are filed, the trial court's judgment implies all
findings of fact necessary to support it. 
Pharo v. Chambers County, 922
S.W.2d 945, 948 (Tex. 1996).  When
a reporter's record is filed, implied findings are not conclusive and may be challenged
for legal and factual sufficiency.   BMC Software Belgium, N.V.
v. Marchand, 83
S.W.3d 789, 795 (Tex. 2002). 
However, Adam does not challenge the sufficiency of the evidence in his
brief.

 





[15]Cassandra's
Table of Contents in her brief lists a second issue beginning at page 11; however, the brief ends on page 11.





[16]There
is, however, evidence that Cassandra filled a prescription for S.C. for her
pinkeye and she had appointments for the other infected children to see a
doctor the day they were taken to the CPS office for interviews.  

 





[17]While
we recognize that Cassandra's conduct was directed at children which were not
hers, it is not necessary that the questionable conduct be directed at the
children the subject of the proceeding to determine whether termination of her
parental rights is appropriate.  See Texas Dept of Human Services v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987).  See
also In re Baby Boy R., 191 S.W.3d 916, 925 (Tex.App.--Dallas 2006, pet.
denied), cert. denied, 549 U.S. 1080,
127 S.Ct. 729, 166 L.Ed.2d 567 (2006) (noting that a parent's conduct toward a
stepchild will suffice to support termination of another child).





[18]Endangering
conduct toward other children or family members is relevant under section
161.001(1)(E) to a determination of whether a parent
engaged in conduct that endangered the children that are the subject of the
suit.  See In Interest of D.L.N., 958 S.W.2d 934,
939 (Tex.App--Waco 1997, pet. denied),
disapproved on other grounds, In re
J.F.C., 96 S.W.3d at 267.





[19]It
is noteworthy that the Department gave D.V. custody of N.C. and J.C. knowing
that D.V. had been validated for abuse against another granddaughter.

 





[20]Notwithstanding
that several of the children's behavior is consistent with sexual abuse, the
Department was unable to validate any allegations of sexual abuse against Adam.

 





[21]Although
we could affirm the termination order based on this finding alone, we will
address the remaining grounds for fairness and certainty.  See In re A.B., 125 S.W.3d 769, 776 (Tex.App.--Texarkana 2003, pet.
denied).